**HOME INS. CO. OF NEW YORK et al.**

v.

**DAVILA.**

No. 4724.

United States Court of Appeals
First Circuit.

May 12, 1954.

James R. Beverley and Carmen B. Hernandez, San Juan, P. R. (R. Castro Fernandez, San Juan, P. R., on brief), for appellant.

Marcelino Romany, San Juan, P. R. (Romany & Romany, San Juan, P. R., on brief), for appellee.

Before MAGRUDER, Chief Judge, and MARIS and WOODBURY, Circuit Judges.

MAGRUDER, Chief Judge.

Vicente Davila held fire insurance policies issued by The Home Insurance Company of New York and by Sun Insurance Office, Limited, covering three buildings (with contents) owned by him in Jayuya, Puerto, Rico, *viz.*, a theater building, a bakery, and a two-story concrete dwelling house. These three buildings were burned on October 30, 1950, as an incident of the uprising staged on that day by a little band of extremists calling themselves the Nationalist Party of Puerto Rico.

Each of the policies in question contained the following provision:

*"Perils not included.*

"This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by: (a) enemy attack by armed forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; (b) invasion; (c) insurrection; (d) rebellion; (e) revolution; (f) civil war; (g) usurped power; * * *."

On the other hand, fire losses resulting from a "riot" were intended to be covered; for the policies provided that there should be no liability for losses occurring "as a result of explosion or riot, unless

fire ensue, and in that event for loss by fire only."

Plaintiff filed a single complaint in the insular district court, joining three separate causes of action based upon his fire losses aforesaid. On the ground of diversity of citizenship the case was removed to the United States District Court for the District of Puerto Rico.

By way of anticipating a defense of settlement and release, the complaint alleged:

"That plaintiff, Vicente Davila, filed his claims with the defendant corporations and the latter sent their representative, who examined the premises destroyed; that the said representative, availing himself of his vast knowledge of the Insurance Law and of the ignorance of plaintiff, made the latter believe that he did not have any right whatsoever to make any claim under the above mentioned policies, and availing himself of the aforesaid false and deceitful statements made plaintiff accept gratefully and as a gift a grossly inadequate amount which did not cover even remotely the total loss suffered and which plaintiff would have never accepted had it not been for the false and deceitful pretenses of defendants agent to plaintiff."

The answer of the defendants set up two special defenses: (1) That the insurers were not liable under the policies, because the fire losses in question had been caused by one of the excepted perils, and (2) that in any event, defendants had made payments "ex gratia" to the plaintiff totaling $12,000, in consideration of which the plaintiff had voluntarily and in writing waived further claims on the policies, the receipt by plaintiff of such payments having constituted, in each instance, an accord and satisfaction.

At the close of the plaintiff's evidence, the defendants moved for a directed verdict, on the ground that the plaintiff had produced no evidence of such fraud and deceit on the part of the representative of the insurers as would invalidate the settlements and releases. This motion the district court denied; where-upon the defendants proceeded at some length to put in evidence bearing on the issues raised by both the special defenses contained in the answer. It is well-settled that if a motion under Rule 50(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., asking for a directed verdict at the close of the plaintiff's case is denied, and the defendant thereupon presents his own evidence, this constitutes a waiver of the motion; unless a renewed motion for a directed verdict is made at the close of all the evidence, the defendant is precluded from questioning on appeal the sufficiency of the evidence to take the case to the jury. Minnehaha County v. Kelley, 8 Cir., 1945, 150 F.2d 356, 359; Ruud v. American Packing & Provision Co., 9 Cir., 1949, 177 F.2d 538, 542. In the instant case, defendants made no motion for a directed verdict at the close of all the evidence, under Rule 50(b); nor did they, after the jury had returned its verdict for the plaintiff, move for judgment notwithstanding the verdict. In the present posture of the case, even though we thought that the evidence was not sufficient to sustain the jury's verdict, we could not upon remand direct the district court to vacate the judgment for the plaintiff and enter judgment for the defendants notwithstanding the verdict. See Cone v. West Virginia Pulp & Paper Co., 1947, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849; Globe Liquor Co., Inc. v. San Roman, 1948, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177; Johnson v. New York, N. H. & H. R. Co., 1952, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77. We could, of course, reverse for errors in admission or exclusion of evidence, or errors in instructions to the jury; but in that event the case would have to be remanded for a new trial or other proceedings not inconsistent with our opinion.

In an earlier case, this court was made aware of the revolutionary objective of the Nationalist Party of Puerto Rico. See Albizu v. United States, 1 Cir., 1937, 88 F.2d 138, certiorari denied, 1937, 301 U.S. 707, 57 S.Ct. 940, 81 L.Ed. 1361, in which we sustained convictions of Pedro Albizu Campos, the leader of the party,

and others of his associates, for conspiracy to accomplish the political independence of Puerto Rico by force and violence and by armed revolution against the United States.

The present record contains uncontradicted evidence that when Albizu Campos returned to Puerto Rico in 1947 after having served his sentence in a federal penitentiary, he and his associates promptly resumed their incendiary program. In various public speeches, he urged revolution as a patriotic duty and the necessity of achieving independence for Puerto Rico by force and violence. The party set up a rudimentary military organization, in numbers not very formidable, styled the Liberating Army of the Nationalist Party, in command of designated officers, and with a cadet corps which engaged in some military training and exercises. They assembled an assortment of small firearms and weapons, and manufactured a quantity of dynamite bombs and "Molotov cocktails".

At the appointed hour of noon on October 30, 1950, the Nationalist conspiracy erupted into violent action at various places on the Island. Though the outbreaks did not result in the imposition of martial law, they were regarded as a sufficiently serious challenge to the established order to call for the mobilization of the National Guard of Puerto Rico, detachments of which were despatched to the disturbed areas to restore order.

In the town of Jayuya, four carloads of young Nationalists arrived at the police station, opened fire and killed or wounded three of the four policemen on duty, and then burned the police station. Also, members of the attacking group set fire to the mayor's house, the post office building, and numerous other buildings, including the theater, the bakery, and the dwelling house owned by the present plaintiff-appellee. Firemen were prevented from fighting the flames. The Nationalist flag was raised atop the roof of the River Palace Hotel. It does not appear, however, that the Nationalists actually undertook to install in the town any provisional local officials. Rather,

the regularly constituted authority was paralyzed, most of the citizens fled, and the life of the community came to a standstill. Police re-enforcements which were sent from San Juan camped for the night on the outskirts of the town. The next morning, units of the National Guard entered the town unopposed, removed the Nationalist flag from the hotel, arrested many Nationalists and sent them to San Juan for further investigation, and re-established the civil authority.

Similar outbreaks occurred in Peñuelas, Arecibo, Utuado, and other places. A projected attack on Ponce was squelched before it got started, due to action of the authorities on the basis of advance information. In the capital city of San Juan five Nationalists, one of them said to be a colonel of the "Liberating Army", got out of a car and proceeded to open fire on La Fortaleza, the official residence of the governor. Four of the five were promptly shot dead by the police on duty, and the fifth wounded. Units of the police laid siege to the headquarters of Albizu Campos at the Nationalist Club in San Juan. Shots were exchanged, and finally capitulation of the occupants of the club was achieved by the use of tear bombs. With a towel tied to a broomstick as a symbol of surrender, Albizu Campos and some of his followers came out and were arrested. The Nationalists implicated in the uprising were subsequently prosecuted and convicted in the regular courts of the Island for various criminal offenses.

Of course the facts of this Nationalist outbreak speedily became a matter of common notoriety throughout Puerto Rico. In the case of Guadalupe v. Bravo, Warden, 71 P.R.R. 913, decided December 18, 1950, the Supreme Court of Puerto Rico took judicial notice of the events of the week of October 30, 1950, which the court characterized as "a revolt in Puerto Rico" staged by the Nationalist Party. Though the word "revolt" is a common synonym of "insurrection", obviously this case was not a determination that the fire losses now in question were caused by one of the excepted perils with-

in the meaning of the particular insurance policies. On December 6, 1950, the legislature of Puerto Rico passed Act No. 6 to provide for the payment of pensions to members of the insular police, the National Guard, and firemen of the insular fire service who were disabled in the course of the outbreak, and to their widows where death ensued in line of duty. In the Statement of Motives incorporated into Act No. 6, the legislature recited:

"During the week commencing October 30, 1950, a band of armed gangsters belonging to the so-called Nationalist Party launched a series of attacks against organized government and the Puerto Rican Community. Police stations were attacked, and members of the Police Force, and members of the National Guard, while on duty for the preservation of the public order, were also attacked. The wave of criminal destruction reached a point where a small band of fanatics attacked La Fortaleza and had to be repulsed by the police officers there on duty. In the development of the plans of destruction which moved them, this band of fanatics set fire to buildings, and on one occasion a fireman was killed while he was trying to put out the very fire started by those who assassinated him." (Laws P.R., 5th to 12th Spec.Sess. 1950–51, p. 318.)

On January 10, 1951, the legislature passed Act No. 14 creating a Commission for the Relief and Reconstruction of the Municipality of Jayuya. The accompanying Statement of Motives recited:

"On October 30, 1950, there occurred in the Island of Puerto Rico an outbreak of criminal, subversive, and violent activity, on the part of a band of persons who made an attempt to destroy the democratic institutions of Puerto Rico through wholesale assassination and murderous attempts, and through setting fire to and destroying public and private property and buildings.

"The Municipality of Jayuya was particularly a victim of these terrorist activities, inasmuch as in that town several persons were assassinated or wounded by this band of terrorists, and a large number of public and private buildings and pieces of real and personal property were damaged." (Ibid., p. 402.)

In the present case the trial judge left to the jury, as a question of fact, to find whether the fire losses were caused directly or indirectly by one of the excepted perils. We do not say that this was error. We do not say that the evidence in the case would, as a matter of law, admit of only one conclusion, *viz.*, that the fires were caused by insurrection or rebellion within the meaning of the policies. For the reason already indicated, this court does not now have before it the issue whether there was sufficient evidence to take the case to the jury. But we do conclude that there was reversible error in the instructions given to the jury on this issue, instructions which, we think, were too heavily weighted in the plaintiff's favor, and which, if faithfully followed, practically required a verdict for the plaintiff.

██ An insurance company is within its rights in defining in the insurance contract the risks which it is willing to assume. Evidently here, the underwriters were not willing to insure against all fire risks; they undertook to exclude certain extraordinary risks of a generally similar nature where the losses might well be ruinous and where the ordinary protection of property by the civil authorities would presumably be unavailing. "Policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties. This is entirely consistent with the rule that ambiguities should be construed most strongly against the underwriters, and most favorably to the assured." Insurance Co. v. Boon, 1877, 95 U.S. 117, 128, 24 L.Ed. 395. The various categories of excepted perils are not words of invariable precision; some of them may overlap or merge into one another. But the words used are certainly not merely repetitious or interchangeable. Here the defendants do not claim that the losses were due to "enemy attack by armed

forces", "invasion", "civil war", or "usurped power". So far as this case is concerned, the more significant words are "insurrection" and "rebellion".

■ In Appleman, Insurance Law and Practice § 3111 (1941), it is said: "An 'insurrection' refers to a revolt, rebellion, or seditious uprising against the government." Sometimes the word "insurrection" is used to characterize an outbreak or disturbance more limited in its objective than the forcible overthrow of the government—for instance, where the civil authority in a community has been defied and temporarily rendered impotent in consequence of a labor struggle. See In re Charge to Grand Jury, D.C.N.D.Ill. 1894, 62 F. 828; Ex parte McDonald, 1914, 49 Mont. 454, 143 P. 947, L.R.A. 1915B, 988; Moyer v. Peabody, 1909, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410. But we are dealing here with the meaning of "insurrection" in an insurance policy which expressly covers fires set in consequence of a "riot"; and which contains no exclusion of fires caused by a "civil commotion", a category which insurers sometimes include in a clause of excepted perils. See Insurance Co. v. Boon, 1877, 95 U.S. 117, 24 L.Ed. 395; Hartford Fire Ins. Co., Hartford, Conn. v. War Eagle Coal Co., 4 Cir., 1924, 295 F. 663. Therefore, we think the district judge correctly told the jury that, to constitute an insurrection or rebellion within the meaning of these policies, there must have been a movement accompanied by action specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof.

■ An insurrection aimed to accomplish the overthrow of the constituted government is no less an insurrection because the chances of success are forlorn. It is no less an insurrection because after it was suppressed twelve reasonable men on a jury might conclude that the uprising was foredoomed to failure from the start. At the time of its breaking out, an insurrection may not necessarily look impressive either in numbers, equipment, or organization. As the insurrection develops into an affair of greater magnitude, so that the insurgents come into *de facto* control of a definite region of the country, the insurrection may be spoken of as a "rebellion". If the insurrection or rebellion proceeds to the attainment of its objective, *viz.*, the overthrow of the old constituted government and the establishment of a new one in its place, then the movement, retroactively, will be dignified by the characterization of a "revolution". In the The Amy Warwick (Prize Cases), 1862, 2 Black 635 at page 666, 17 L.Ed. 459 the Supreme Court said: "Insurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government. A civil war is never solemnly declared; it becomes such by its acts—the number, power, and organization of the persons who originate and carry it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies; have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a *war*." Later in the same case, 2 Black at page 673, referring to the "rebellion" organized by the Confederate States, the Court said: "It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force—south of this line is enemies' territory, because it is claimed and held in possession by an organized, hostile and belligerent power." In other words, at its inception an insurrection may be a pretty loosely organized affair. The first forcible action of the insurgents need not necessarily be directed against military establishments of the regularly constituted government. It may start as a sudden surprise attack upon the civil authorities of a community with incidental destruction of property by fire or pillage, even before the military forces of the constituted government have been alerted and mobilized into action to suppress the in-

surrection. When an insured suffers a fire loss at such an incipient stage of the insurrection, it must be deemed a loss by fire caused directly or indirectly by insurrection, within the meaning of the exclusionary language of the policies, even though the insurrection has not yet proceeded to a stage where rebel armed forces, militarily organized, staffed, and equipped, are actually engaged in military operations against an army of the constituted government which has taken the field against them.

When Napoleon Bonaparte in 1815 left the island of Elba, landed in southern France with a small body of men and started on the way to Paris, he no doubt launched an insurrection against the Royalist government of France. He expected to be received with open arms by the populace and counted on defections from the Royalist armies despatched against him. In this case his hopes and expectations were fulfilled, and his insurrection achieved its object in the overthrow of the Royalist government. But if the event had turned out the other way, Napoleon's operation from the outset would still properly have been described as an insurrection, though an unsuccessful one.

From the evidence it was a matter of inference what was in the minds of Albizu and the other Nationalist leaders as the objective of the uprising of October 30, 1950. Certainly the speeches of Albizu seemed designed to impress upon his followers the coming of the hour of revolution—already too long delayed—when they must be prepared, if necessary, to give their lives for the independence of Puerto Rico. Defendants called as witnesses two former cadets in the "Liberating Army". Guillermo Hernandez Vega testified to the preparations that were made for the uprising. He was instructed to proceed with a group to attack the police station at Arecibo, to "finish off all the police", to set fire to the public buildings; then "to form guerrilla groups up in the mountain, who were going to attack the banks and the post office, in order to be able to control the situation, while the provisional government was

put in force." It "was expected that the civil population would join the movement", because "it was thought that a great part of the civilian population was in favor of the independence of Puerto Rico, and that as soon as the government Rico, and that as soon as the Government was beset a lot of persons would come with us." Also it was expected, said Hernandez, "that the National Guard would not intervene." Hernandez gave it as his "personal opinion" that the movement would not be successful in its objective of overthrowing the government; for that reason he did not participate in his assignment at Arecibo, but threw his weapon in the ocean and "went home." The other ex-cadet who testified was Gabriel Arvelo Garcia, who described himself as formerly third in command in Utuado of the cadet corps of the Liberating Army. He also testified as to the revolutionary purpose of the Nationalist Party and the preparations for the uprising. He was assigned to participate in an attack on the police headquarters, the city hall and the post office at Utuado, to "take the town of Utuado." A Nationalist had been selected in advance to assume office as provisional mayor. If the surprise attack turned out to be successful, they hoped to "get the help of the civilians in Utuado" to "go over to another town." When the hour struck, Arvelo also declined to fulfill his assignment. He "stayed at home." When asked why he refused to comply with the oath he had taken to the Nationalist Party, he gave the priceless answer, "Because my conscience told me that it was something that was not going to be successful."

While these two individual cadets, Hernandez and Arvelo, might not have been so caught up with the irrational fervor of the movement as to have lost all sense of judgment and perspective, it by no means follows that this was so in the case of Albizu and the other leaders of the Nationalist Party. It was they who made the plans, gave the assignments and orders, and set afoot the outbreak of October 30, 1950. Whether it was an "insur-

rection" or not depended upon what was in their minds as the objective, or objectives, of the uprising.

It is to be remembered that if an armed rebellion was to be instigated with any conceivable hope of success, time was running out on the Nationalist Party. On June 30, 1950, Congress had passed Public Law 600, "adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." 64 Stat. 319. The people of Puerto Rico were soon to vote on whether to accept or reject the terms of the compact thus offered to them. If the vote should be in the affirmative, and the people of Puerto Rico should thereupon set about to organize a government pursuant to a constitution of their own making, then the claim that Puerto Rico was being held in forcible subjection by the United States would become even more obviously an empty pretense. In that situation it might well have appeared to the Nationalist Party leaders, when they planned the uprising of October 30, 1950, that it was "now or never", however desperate might appear to be the hope of maximum success.

It could be that the Nationalist leaders had (1) a maximum objective—with the realization that it had only an off-chance of accomplishment, depending as it did upon the movement's developing and rolling along as they hoped, with the populace rising to their support, under the contagion of local successes—and at the same time, (2) a lesser or minimum objective.

This maximum objective, we suppose, would have been the overthrow of the insular government, with a provisional Nationalist government in *de facto* control of the Island. In that event, this provisional government might still have had to face the armed might of the United States, and we doubt whether even Albizu could have imagined that the provisional government could hold out against the United States, if the United States should decide to exert the overwhelming strength of its army, navy, and air force to retake the Island and throw out the usurping power. What the United States would have chosen to do in that event is a matter of pure speculation; but there is no doubt that the United States would have had an "insurrection" or "rebellion" on its hands.

The minimum objective might have been to create a series of local disturbances, or "civil commotions", in various towns of Puerto Rico, to embarrass and discredit the insular government, to dramatize the fact that there were "patriots" in Puerto Rico prepared to die for the ideal of freedom, for propaganda purposes to fire a shot "heard around the world". If that objective, upon a more realistic appraisal of the possibilities, had been the only objective of the Nationalist leaders, then we would agree that the outbreaks of October 30, 1950, did not constitute an "insurrection" within the meaning of the particular insurance policies. But if the Nationalist leaders, however inept they might have been in their calculations and preparations, had also in mind the maximum objective aforesaid, then the uprising was an "insurrection"; and no less so, as we have above indicated, even if reasonable men might conclude that this objective was not possible of accomplishment.

 From the foregoing discussion it will be clear, we trust, why we have come to the view that the instructions to the jury on this issue were unduly favorable to the plaintiff. Extracts from the judge's charge on this issue are reproduced in the footnote.[1]

1. "These terms have been held interchangeable with the other terms used in said condition, as noscitur a sociis, to denote situations where rebel armed forces, militarily organized, engage in military operations with Government armies actually intending the overthrow by the former and the preservation by the latter of a lawfully organized government.

"Armed forces, militarily organized, is not an empty expression. It implies that the rebel forces must at least be staffed, equipped and have the resources which military organizations engaging in such actions must of necessity have.

"The attempt to overthrow a lawfully constituted government must be the purpose of the movement. Attempt is no

We come now to what we think was another reversible error, relating to the instructions to the jury on the validity of the settlements and releases which had been negotiated by a representative of the insurance companies with the plaintiff. So far we have not stated the facts bearing on this issue. They are not in substantial dispute.

As previously stated, the complaint alleged that plaintiff had been induced to settle his claims for a "grossly inadequate amount" in reliance on "false and deceitful statements" by the insurance agent to the effect that plaintiff had no rightful claims under the terms of the policies. There was no attempt to show any actual fraud on the part of the insurance agent, *i. e.,* fraud in the sense that he had made any consciously false representations. In fact, when counsel for the defendants sought to show, in examination of the insurance agent, that he bona

fide believed, and had reasonable ground to believe, in the truth of his expressed opinion that the insurance companies were not liable under the terms of the policies, the trial judge ruled out this line of inquiry as irrelevant, on the ground that the bona fides of the agent was immaterial. In the mind of the trial judge, the two special defenses set up in the answer were tied up together. If the jury should find (as it did) that the fire losses in question were not caused by an insurrection or rebellion within the meaning of the policies, then they were told that they *must* find for the plaintiff also on his claim that the statements made by Acosta that the fire losses in question were not within the coverage of the policies were "false and deceitful", and they were further told that they might disregard the releases if they should find that the plaintiff was overreached in the settlement thereby induced because of plaintiff's

mere desire, nor is it mere advocacy. Either jointly or separately they would never give life to a rebellion or an insurrection. There must exist an actual purpose, accompanied by action, specifically intended to overthrow a lawfully constituted government and take possession of the inherent powers thereof. Some degree of faith on the part of insurgents in the success of their cause must be present, and the action taken should fall within such bounds as reasonable men may soundly believe of possible accomplishment.

"The attempt must be actually directed against the power intended to be overthrown by the insurgents.

"Though not required to be successful, the attempt must at least, be of such a nature that it cannot be suppressed by the ordinary course of judicial proceedings or by the powers vested in the Marshals, District Attorneys and Police Forces. Civil authorities must be made helpless to cope with the situation, and the military take over.

"The loss should be a direct or indirect consequence of military operations between the rival forces, and must have occurred in the course, or as a necessity of said military operations conductive to the taking by the rebels or the protection by the government forces of military objectives, or to retard the advance of either of said opposing forces. * * *

"The evidence shows that the Nationalist Party of Puerto Rico and its members desired and advocated the overthrow of the United States Government. It is up to you, gentlemen, to determine whether the evidence of record as to the action taken by these different groups in different places in Puerto Rico establishes or not that the participants therein actually intended thereby to overthrow our National Government, or whether they had some other motive or intent. * * *

"I instruct you that an armed protest whose purpose is to inconvenience the government in its international relations is not an insurrection or rebellion within the meaning and intent of the aforesaid conditions of the policies.

"You must further consider in this connection that there is no evidence whatsoever of any assault against any of the military establishments or strategic positions of the United States Government in Puerto Rico, though the claim is that the alleged attempt was exclusively concerned with said government. * * *

"You must finally determine, gentlemen, in connection with this issue, whether the evidence of record shows or does not show that plaintiff's properties were destroyed in the course, or as a necessity of any military operations between any rebel armed forces, militarily organized, and any government army, to take or prevent the taking of military objectives or to retard or protect the advance of any contending armed forces, militarily organized. * * * "

trust in said agent and the agent's position of advantage in respect to his greater familiarity with the law of insurance. Extracts from the charge to the jury on this issue are printed in the footnote.[2]

After the fire losses occurred on October 30, 1950, the insurance companies employed Mr. Benjamin Acosta of Santurce, Puerto Rico, an independent insurance adjuster, to handle for them the various insurance claims in Jayuya and to recommend the action to be taken by the companies in each particular case. The plaintiff described Acosta as a "friend", but it appears that they had only seen each other two or three times before, in connection with the adjustment by Acosta of a claim by the plaintiff for an ear-lier fire loss. Acosta came to Jayuya on November 9, 1950. He got in touch with Mr. Davila, to whom he stated, quite properly, that before he would proceed to investigate the plaintiff's fire losses, it would be necessary for the plaintiff to sign a so-called non-waiver agreement to the effect that investigation by the insurance agent into the claimed fire losses should not be interpreted as a waiver by the companies of any defenses which they might have under the terms of the policies. The plaintiff after consulting a lawyer signed this non-waiver agreement. Thereupon Acosta and the plaintiff undertook to reach an agreement as to the amount of the fire losses which the plaintiff had suffered. When the amount of

2. "If you gentlemen find that said fire was a direct or indirect result of a rebellion or insurrection within the meaning and intent of the exclusory condition of the policy, then you must find for the defendants on all three causes of action.

"But if you find that under the evidence of record, and the law as given to you by the Court on said issue, no rebellion or insurrection within the contemplation of said exclusory condition ever occurred, and that the fire, thus, was not the direct or indirect result of any such rebellion or insurrection, then you must find for plaintiff on said issue, as well as on his claim that the aforesaid statements made by defendants' representative and appearing in the assailed releases, were false and deceitful.

"This does not mean that after so finding you may be bound to find for plaintiff on his complaint.

"You will still have to determine whether, in spite of this false and deceitful statement, plaintiff's evidence sufficiently supports his claim that on account of his alleged limited education, ignorance of the insurance law, lack of information and knowledge in these matters, in comparison with the alleged superior position in this respect enjoyed by Mr. Benjamin Acosta, who, as adjuster and representative of the defendants, was instrumental in obtaining plaintiff's acceptance of the terms of said releases; as well as his claim that the amounts received by him as ex-gratia payments under said releases were grossly inadequate in comparison with the actual loss by him suffered."

Notwithstanding the above, there was a further paragraph in the charge which, if taken literally, would seem to have been to the contrary effect. The court further told the jury:

"You are instructed that in order that the releases may be set aside for false and deceitful misrepresentations as charged by the plaintiff, you first have to find for plaintiff on the first issue above discussed, and then you will have to determine further whether the false and deceitful representations so found to have been made by defendants to plaintiff had the purpose of obtaining for defendants an unconscionable advantage over the plaintiff by inducing him to sign the release, which representations believed to be true, being thereby induced to act to his detriment by signing said release."

How could the insurance companies have had the purpose of obtaining "an unconscionable advantage over the plaintiff" in offering to him a payment of fifty per cent in settlement if the insurers and their representative honestly believed (though perhaps erroneously) that under the terms of the excepted perils clause they were not liable for anything? This paragraph in the charge might therefore seem to imply that in order for the jury to bring in a verdict for the plaintiff, in disregard of the releases, they must find that the representations of non-liability were made in bad faith, without belief in their truth. But it is clear from the charge as a whole that the trial judge did not mean this, and the case was tried on a different theory. In view of the jury's finding for the plaintiff, it is evident that they could not have taken this last-quoted paragraph of the charge literally, for there was no basis in the evidence for a finding that the representations of non-liability were made in bad faith.

the plaintiff's damages had thus been agreed upon, Acosta told him that he could not promise him anything at the time; that in his personal opinion, under the clause in the policies excluding liability for losses caused by insurrection or rebellion, the companies were not legally liable for the losses in question. He told the plaintiff, however, that he would recommend to the companies that they pay to the insured fifty per cent of the damages suffered, on an *ex-gratia* basis, without accepting liability on the policies.

Later on, the companies instructed Acosta to go ahead and offer settlements to the plaintiff and to the other claimants on the basis recommended by the insurance agent. Accordingly, Acosta prepared in his office, around the middle of January, 1951, documents of release to be used in concluding these settlements. We quote the terms of a typical release; they were all in substantially the same form:

"Voluntary Release Through Payment Ex Gratia.

"I, Vicente Davila, of lawful age, insured under Policy No. 3103/1692 of the Home Insurance Company, by these presents withdraw all claim that I have or may have under said insurance contract and voluntarily waive institution of judicial or legal action against said Home Insurance Company as a result of the damages suffered by the properties described in said policy as a result of the Nationalist insurrection or revolution in the months of October and November 1950.

"I voluntarily waive my claim under this policy as I have accepted the sum of $4,250.00 from the Home Insurance Company as payment ex gratia.

"The Home Insurance Company has informed me that there is no liability whatsoever under the insurance contracts mentioned and I accept such decision as final, withdrawing forever my claim and waiving forever the right to institute judicial or legal action against said Home Insurance Company for the damages suffered by the insured property under the aforesaid policy."

█ Shortly thereafter plaintiff called at Acosta's office to inquire about the status of the negotiations, and was informed what the companies were willing to do. Acosta gave him the releases to sign. Plaintiff took these releases away with him, without signing them at that time, and kept them for two weeks. He testified that during this period he did not seek legal advice as to whether he should sign the releases; and there is no evidence in the record that he did. It is clear, however, that the insurance agent did not try to dissuade the plaintiff from seeking legal advice, which certainly the plaintiff had ample opportunity to procure, and which, we have seen, the plaintiff did procure before signing the non-waiver agreement. The insurance agent was not under the burden of any fiduciary relationship with the plaintiff, and the settlement must be deemed to have been negotiated on an arm's-length basis. Though the plaintiff was a person of limited formal education, he was a practical and successful businessman in Jayuya, with substantial property holdings.

Plaintiff testified that he never read the terms of his fire insurance policies. But the insurance agent made no misrepresentations as to the contents of the policy provisions. Nor did he make any misrepresentation of fact as to the events which occurred in Puerto Rico on October 30, 1950, and which might or might not have amounted to an insurrection or rebellion within the meaning of the excepted perils clause. Those events were indeed matters of public notoriety, as well-known to the plaintiff as to Acosta. We have stated above that on December 18, 1950, the Supreme Court of Puerto Rico took judicial notice of these events, in describing the uprising of October 30 as a "revolt". Guadalupe v. Bravo, Warden, 71 P.R.R. 913, 926.

█ In the nature of things, one could not know for sure whether this uprising constituted an insurrection or rebellion within the meaning of the insurance policies until the courts had determined the point in the course of litigation. All that Acosta could do was to express an opinion, perhaps an informed opinion in view of his experience in the insurance field, as to what the courts

would or should determine in the matter. And if he truly expressed the opinion which he entertained, he made no misrepresentation of any kind, either of fact or of law.

Two weeks later Davila brought the releases back to Acosta's office, still unsigned. He was informed that he could not obtain from the companies the fifty per cent payments offered, unless he signed the releases. Thereupon the plaintiff took the releases to a notary public and formally executed them. Payments totaling $12,000 were then made to the plaintiff pursuant to the terms of the settlements.

Under the circumstances above related, the insurance companies, or their representative, might well have honestly believed, and not without reason, that they had a good legal defense to the claims, under the terms of the excepted perils clause. Was the case not, therefore, an appropriate one for a settlement, avoiding the hazards of litigation, on some basis other than payment of the losses in full? And how was the insurance agent to explain a company offer to settle for one half the fire damages sustained, except by asserting the company's view that the particular fire losses were not within the policy coverage? Yet on plaintiff's theory, as expounded by his counsel at the trial, the insurance agent "should not have said anything about liability at all"; that if, in negotiating and inducing a settlement, he represented, however innocently and in good faith, that the insurers were not legally liable, and it turned out that he was mistaken in this view of the law, this would constitute such a false and deceitful representation as would invalidate the settlement and release negotiated by an insurance agent having presumably superior knowledge of the field of insurance law, as contrasted with the insured, who was ignorant of such matters and who, according to plaintiff's story, blindly accepted the insurance agent's assertion of non-liability without seeking outside legal advice, which he had ample opportunity to do.

Plaintiff's theory as to the invalidity of the releases, which we gather the trial judge in substance accepted, seems to have originated in a misapplication of our decision in Camerlin v. New York Central R. Co., 1 Cir., 1952, 199 F.2d 698. In the Camerlin case, the railroad claim agent went to the home of the disabled plaintiff, an uneducated laborer who had been injured while working as an employee of the railroad, and then and there persuaded the plaintiff, being without advice of counsel, to sign a release in consideration of a check in the sum of $950 in settlement. To make it appear that the sum offered was reasonable under the circumstances, the claim agent represented to the plaintiff that he was entitled to compensation, as provided by the New York Workmen's Compensation Act, McK.Consol.Laws, c. 67, only at the rate of $25 per week for the period he was laid up. Thereby plaintiff was induced to sign the release upon the mistaken assumption that his rights were limited by the scale of compensation afforded by the New York Act; whereas he was entitled to recover, in an amount not limited by any statutory maximum, under the Federal Employers' Liability Act, 45 U.S.C. A. § 51 et seq., which, being applicable to the accident, was his exclusive remedy. Under the particular circumstances, we thought that it would be inequitable to allow the railroad to insist upon the release, in view of the relationship of the parties, the company having negotiated a settlement directly with its own ignorant employee; and that this was so whether or not the claim agent had represented in good faith or in bad faith that the employee's right to compensation was governed by the New York Workmen's Compensation Act. In so concluding we relied upon American Law Institute, Restatement of Restitution, § 55, providing in effect that a settlement might be rescinded where one party accepted it in reliance upon an innocent representation of law by the other, provided in the particular circumstances such reliance could be deemed to be "justifiable"; and Comment c thereto contains the caution that

normally "statements of domestic law should not be relied upon when they are made by the other party to a transaction."

In other words, in the Camerlin case we were applying what we thought was the federal rule in an Employers' Liability Act case, where the railroad had made a settlement directly with its own trusting and uneducated employee. The case at bar has an entirely different setting, and the rule to be applied is one of Puerto Rican local law. We have been unable to find any decision of the Supreme Court of Puerto Rico suggesting that an agreement of settlement and release could, under the law of Puerto Rico, be upset on so flimsy a basis as that advanced by the plaintiff in the present case. It would be unfortunate if such were the law, and we do not believe that it is.

The judgment of the District Court is vacated and the case is remanded to that Court for further proceedings not inconsistent with this opinion.