AGUSTÍN CRUZ VÉLEZ, Plaintiff and Appellee, *v.* LIVERPOOL AND LONDON & GLOBE INSURANCE COMPANY, Defendant and Appellant. ABRAHAM DE JESÚS, Plaintiff and Appellee, *v.* THE GREAT AMERICAN INSURANCE COMPANY, Defendant and Appellant.

No. 11360. Argued April 3, 1956.—Decided November 23, 1956.

R. *Rivera Zayas*, G. *Rivera Cestero* and *Milton F. Rúa*, for appellants. *Romany & Romany* for appellees.

MR. JUSTICE MARRERO delivered the opinion of the Court.

Since the above-entitled cases involve identical questions of fact and of law, they were heard jointly in the lower court as well as here. In both cases ample oral and documentary evidence was introduced and in both cases the lower court rendered judgment against defendants. They appealed and assign three errors allegedly committed by the lower court. We believe only the first error merits discussion.[1] It alleges that the court erred "in holding that the releases or waivers signed by the plaintiffs, settling their claims with the defendants, were not valid." Before passing to discuss that error, let us first examine the findings of fact, pertinent to the question involved, which are set forth in the opinion of the trial court in support of its judgment:

"1.—That defendants Great American Insurance Company and Liverpool and London & Globe Insurance Company, are two foreign corporations duly authorized to do insurance business in Puerto Rico, and both carry out their business through their general agent Compañía Carrión, Inc.

"2.—That the plaintiff Abraham de Jesús, on October 30, 1950, was the owner of a building used as a *cafetín* in Jayuya, which he had insured under a fire insurance policy for a maxi-

---

[1] The other two errors assigned are:

"SECOND ERROR: The lower court erred in holding that the loss allegedly suffered by the plaintiffs was not excluded from the respective insurance contracts existing between the plaintiffs and the defendants.

"THIRD ERROR: The lower court erred in holding that Agustín Cruz Vélez had suffered a total loss which amounted to a sum exceeding Four Thousand Dollars ($4,000), and that Abraham de Jesús had suffered a partial loss by fire in the insured building, merchandise, and equipment in the total sum of Three Thousand Dollars ($3,000)."

mum liability of $10,000 issued by the defendant corporation The Great American Insurance Co., in favor of the plaintiff Abraham de Jesús, covering the loss that the insured building, as well as the merchandise and the equipment thereof might suffer on account of fire, the policy providing for a maximum liability up to $6,000 for loss as to the building, a $1,500 limit merchandise loss, and a $2,500 limit for loss in the equipment.

"3.—That plaintiff Agustín Cruz Vélez, on October 30, 1950, was the owner of a dry-goods store in Jayuya, Puerto Rico, which was insured under a fire insurance policy for a maximum liability of $4,000 issued by defendant corporation Liverpool and London & Globe Insurance Company, in favor of plaintiff Agustín Cruz Vélez, covering any fire loss on the dry goods in stock.

"4.—That on October 30, 1950, several persons went on a riot, and opened fire against the insular police station of Jayuya and against the policemen there on duty, burning the police station, and later the city hall; that the fire spread to the plaintiffs' commercial establishments, destroying the dry goods insured by Agustín Cruz Vélez and partially destroying the insured building, merchandise, and equipment belonging to Abraham de Jesús.

"5.—That after these acts were performed, at 5 o'clock in the afternoon of that day, the incendiaries withdrew to the outskirts of the town of Jayuya abandoning the place.

"6.—That the two insurance policies issued in these cases contain a provision which copied verbatim reads as follows:

" 'This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by: (a) enemy attack by armed forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; (b) invasion; (c) insurrection; (d) rebellion; (e) revolution; (f) civil war; (g) usurped power; (h) and order of any civil authority, with the exception of acts of destruction at the time of and to prevent the propagation of a fire, whenever said fire has not been originated by any of the risks excluded in this policy.'

"       .       .       .       .       .       .       .

"8.—That after the fire in question, plaintiffs Agustín Cruz Vélez and Abraham de Jesús filed their claims with the insurance companies, defendant herein, and the latter sent their representative, Benjamín Acosta, to examine the destroyed property; that Benjamín Acosta was an insurance adjuster with

vast knowledge of the insurance law, and on the contrary the plaintiffs Agustín Cruz Vélez and Abraham de Jesús were laymen as regards insurance, being fully ignorant of the Insurance Law; and the court concludes that the adjuster of the insurance companies, Benjamín Acosta, availing himself of his vast knowledge and of the ignorance of plaintiffs Agustín Cruz Vélez and Abraham de Jesús, made them believe that the fire in Jayuya was set in consequence of an insurrection or revolution, and that, therefore, the insurance companies were not liable for such fire losses, and that plaintiffs did not have any right whatsoever to make any claim against the defendant corporations on account of the fire.

"9.—That plaintiffs Abraham de Jesús and Agustín Cruz Vélez believed the statements of Benjamín Acosta, adjuster for the defendant insurance companies.

"That Mr. Benjamín Acosta, as representative and adjuster of the defendant corporations, drew a document to be signed by Abraham de Jesús, which copied verbatim reads:

" 'VOLUNTARY RELEASE THROUGH PAYMENT EX GRATIA—I, Abraham de Jesús, of legal age, insured under Policy No. 46609 of the Great American Insurance Company, by these presents withdraw all claim that I have or may have under said insurance contract and voluntarily waive institution of judicial or legal action against said Great American Insurance Company as a result of the damages suffered by the properties described in said policy as a result of the Nationalist insurrection or revolution in the months of October and November 1950.

" 'I voluntarily waive my claim under this policy as I have accepted the sum of $250 from the Great American Insurance Company as payment *ex gratia*.

" 'The Great American Insurance Company has informed me that there is no liability whatsoever under the insurance contracts mentioned and I accept such decision as final, withdrawing forever my claim and waiving forever the right to institute judicial or legal action against said Great American Insurance Company for the damages suffered by the insured property under the aforesaid policy.

" 'In witness whereof, I affix my signature hereunto and swear to the present document in Jayuya, P. R., on the first day of February 1951.

" '(s) Abraham de Jesús

682

" 'Aff. No. 3740

" 'Sworn to and subscribed before me by Abraham de Jesús, whom I personally know, on this first day of February 1951, in Jayuya, P. R.

" '(s) Celso Dávila

" 'Justice of the Peace'

"10.—That Abraham de Jesús, induced by Benjamín Acosta's statement, which he believed, signed the document under the erroneous belief that he was not entitled to make any claim whatsoever against the insurance company on account of the fire which had destroyed his insured property in Jayuya.

"11. That Benjamín Acosta demanded that plaintiff Abraham de Jesús subscribe and swear to the former document before a notary or a public officer authorized to take an oath, as a prerequisite for the payment of $250 specified in that document.

"12.—That defendant corporation Great American Insurance Company received such document signed and sworn to before the Justice of the Peace of Jayuya, and once received and accepted by the defendant, Great American Insurance Company, it sent plaintiff Abraham de Jesús the aforesaid amount of $250."

Concerning Agustín Cruz Vélez' case, the lower court made similar findings of fact, it copied verbatim the release which he signed and it set forth that Cruz Vélez received from his insurer a check for the sum of $2,000. It closed its findings of fact as follows:

"17.—The court concludes that plaintiff Agustín Cruz Vélez suffered a total loss which amounts to a sum exceeding $4,000, and that plaintiff Abraham de Jesús suffered a partial loss amounting to $3,000 on account of the fire which burned the insured building, merchandise, and equipment."

The following conclusions of law are also set forth in the opinion of the lower court:

"In the instant case there was no rebellion or insurrection within the meaning of these phrases in an insurance policy.

" .       .       .       .       .       .       .       .

". . . to buttress its conclusions of law, it cites the following instructions given to the jury by the Hon. Clemente Ruiz Nazario, U. S. District Judge for Puerto Rico, in the civil case

filed by Vicente Dávila against The Home Insurance Co. of New York et al, . . ."[2]   [Here it copies at length those instructions.]

"   .         .         .         .         .         .         .         .

"6.—The court holds as a question of law that the alleged releases presented as a defense by the defendant corporations are void, with no value or effect, because they were obtained through false statements made to the insureds to the effect that they were not entitled to any indemnity under their policies because the fire had been caused by an insurrection or revolution. We have shown by our former conclusions that there was no insurrection or revolution in this case but simply a riot.   Fires brought about on account of a riot were risks expressly covered by the policies, and the companies are therefore liable for the losses.

"7.—The court concludes, as a matter of law, that had it not been for the statements of the insurance corporations to the effect that the plaintiffs were not entitled to any claim because the fire was brought about by an insurrection or revolution, the plaintiffs would not have signed such releases nor would they have accepted from the corporation an amount which was exceedingly less than the loss which they suffered.

"8.—The court concludes that there was undue influence in making these statements on the part of the representative of the insurance corporations, who took advantage of the insureds because of his superior knowledge concerning Insurance Law and the ignorance of the plaintiffs on this matter.

"9.—The court holds that in cases of this kind, where an insurance company and an insured are the litigating parties and the insurance company necessarily predominates because of its superior knowledge concerning insurance and the laws regulating it, if the insured, under a false representation of the law by the insurance corporation or by its agents, which it trusts and relying on such erroneous belief induced by the insurance corporation, settles his claim for an amount which is smaller than what the insurance corporation legitimately owes him, such a trans-

[2] The opinion and judgment of the lower court are dated January 7, 1954. The case of *Dávila* v. *Home Insurance Co. of New York* to which the trial court referred in its opinion was reversed and remanded for further proceedings by the United States Court of Appeals for the First Circuit, on May 12, 1954. See *Home Ins. Co. of New York* v. *Dávila,* 212 F. 2d 731.

action is void at law and is not a defense against the insured's claim.

"10.—. . . it is hardly important that the statements or representations on legal questions were made in good faith by the insurance corporations or by its agents. It suffices that they were made, that they were false or erroneous, believed by the insureds and that the latter accepted a lesser amount than what was due to them and all of it because of the false representation."

The lower court also states in its conclusions of law that:

"To support our conclusion to the effect that in this kind of case it is unimportant whether the false representations of law were made in good faith or innocently, it being sufficient that they were made and believed by the insureds, we are going to cite the case of *Camerlin* v. *The New York Central Railroad Co.*, decided by the Court of Appeals for the First Circuit . . . on November 12, 1952." [3]

Based on the former findings of fact and conclusions of law, the trial court sentenced the Liverpool & London & Globe Insurance Company to pay to Agustín Cruz Vélez the sum of $2,000, plus costs and $200 for attorney's fees; and the Great American Insurance Company to pay Abraham de Jesús $2,750, plus costs and $250 for attorney's fees.

We shall now discuss the error copied above. Sections 1709, 1715 and 1716 of the Civil Code, 1930 Ed.—31 L.P.R.A. §§ 4821, 4827 and 4828—provide:

"Section 1709.—A compromise is a contract by which each of the parties in interest, by giving, promising, or retaining something, avoids the provocation of a suit, or terminates one that has already been instituted.

"Section 1715.—A compromise has, with regard to the parties, the same authority as res adjudicata; . . . .

---

[3] The case of *Camerlin* v. *The New York Central Railroad Co.*, 199 F. 2d 698, was cited and clearly distinguished from *Dávila* v. *Home. Ins. Co. of New York*, *supra*, which is similar to the case at bar, by the Court of Appeals for the First Circuit itself. See *Home Ins. Co. of New York* v. *Dávila*, 212 F. 2d 731, 742.

"Section 1716.—A compromise, in which error, deceit, violence, or forgery of documents is involved, shall be subject to the provisions of section 1217 of this Code."

Sections 1213, 1217, 1221 and 1222 of that same Code—31 L.P.R.A. §§ 3391, 3404, 3408 and 3409—also provide that:

"Section 1213.—There is no contract unless the following requisites exist:
"1.—The consent of the contracting parties.
"2.—A definite object which may be the subject of the contract.
"3.—The cause for the obligation which may be established."
"Section 1217.—Consent given by error, under violence, by intimidation, or deceit shall be void."
"Section 1221.—There is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made.
"Section 1222.—In order that deceit may give rise to the nullity of a contract, it must be serious, and must not have been employed by both of the contracting parties."

It is unquestionable that the plaintiffs here entered into separate settlements with the defendants concerning the claims which they believed to have, or which they had, against them. We must determine, therefore, whether or not those transactions were valid. If there was error, deceit, violence or false documents, then those transactions were void for lack of consent, essential requisite for the validity of any contract. Section 1213 of the Civil Code, *supra*. We shall not stop to analyze whether there was error, violence, or false documents, since the parties admit that there was none. Consequently, there is nothing left to do except determine whether there was deceit in the compromise effected. In our opinion, there was no deceit. "Deceit has an exceedingly broad range and includes 'deception, fraud, false representation and undue influence . . . .' " *Cruz* v. *Water Resources Authority*, 76 P.R.R. 291, 298–99. See also *Rivera* v. *Heirs of Díaz*, 70 P.R.R. 168, 172.

We shall examine broadly and insofar as pertinent the testimony of plaintiffs themselves.

*Agustín Cruz Vélez* testified that he studied up to fifth grade, he was then eighteen years old; later he worked as a peon in the Jayuya Central for three years; then as a dry-goods clerk in the establishment of Armando Viñas; later with Zoraido Rivera, also as a clerk in a store; when he left Zoraido he came to San Juan to work for R. Ruiz & Cía., also as a clerk. With the latter he worked a year and then returned to Jayuya. He established his own dry-goods business. Acosta told him "that he was not entitled to collect the policy" and "to sign some papers which he had with him, to give me a gift." "He called the man, the other one, and told him the same thing in front of me. That we had no right to collect the policy because it excluded rebellion. They gave him $2,000." He was 48 or 49 years old and he was the president of the Parents-Teachers Association of Jayuya. He does not remember whether Benjamín Acosta said anything about insurrection, but he does remember that he spoke of a rebellion. On November 15, 1950, he signed the first document and signed the release on January 29, 1951. During that time he spoke to no lawyer or insurance adjuster.

*Abraham de Jesús* stated that he has lived all his life in the wards and town of Jayuya. He had very little schooling, from the first to the second grade. He was enrolled when he was 8 years old and left school when he was 10. At 15 he began working at Central Santa Bárbara gathering root for the oxen. He did that work for 2 years. At 17 he established a vegetable business; he had it for 2 or 3 years and then began selling rice and beans. Then he established a grocery and a *cafetín* which he has had for 18 years. Two or 3 days after the fire Benjamín Acosta appeared there. He did not tell him that he was not entitled to collect; he was sick at the time. Ramón Alfonzo was the one who visited him telling him that he had no right to collect; that if they so wished the company would give them a payment *ex gratia;*

that everybody had signed, that he should sign too. He accepted $250 because everybody signed. "I accepted it because he told me I was not entitled to anything."

The plaintiffs also put *Benjamín Acosta* and *Ramón Alfonzo Reyes* on the witness stand. The first testified that he has 16 years' experience as an adjuster. He went to Jayuya 5 or 6 days or maybe a week after October 30, 1950. He saw Agustín Cruz Vélez. "I told him that as an independent adjuster I believed that insurance companies were not liable under their fire insurance policies because this fire ensued as a consequence of a rebellion or insurrection or usurped power . . . and that since they did not carry that kind of policies with endorsement to collect that kind of loss, in my opinion, the corporations involved had not accepted liability." He further told him that, before going on with the investigation, each insured had to sign an agreement which is called "Non-Waiver Agreement," so that both parties could retain their rights and to prevent any action on their part to be interpreted as acceptance of liability by the corporations. Cruz Vélez took him to all the other insureds, Abraham de Jesús among them. He explained to De Jesús and to the others that they could either accept or reject the agreement and file a claim if they so wished. On that first trip he never offered to compromise.

*Ramón Alfonzo Reyes* testified that Benjamín Acosta sent the waivers directly to the insureds; that he read the document to Abraham de Jesús, indicating he had to take an oath before the Justice of the Peace. [4]

Under the circumstances, we do not believe there was deceit, false representations, or insidious machinations on the part of the insurers. [5] This Court has already taken judicial

---

[4] It appears from the records that Abraham de Jesús signed the "Voluntary Release Through Payment Ex Gratia" before the Justice of the Peace of Jayuya on February 1, 1951, and that Agustín Cruz Vélez signed a similar document on January 29 of that same year, before a notary, in the city of San Juan.

[5] The conclusions of law of the trial court are not binding on us. *Cruz* v. *Water Resources Authority,* 76 P.R.R. 291.

notice of the events of October 30, 1950, in Puerto Rico. We characterized them as a "revolt." *Guadalupe* v. *Bravo, Warden,* 71 P.R.R. 913, 926. We need not decide now whether such events were an insurrection or rebellion. The question for decision right now is whether the insurers honestly and in good faith believed that such events constituted an insurrection or rebellion. That is not an easy determination and we repeat it is not necessary to make it now since we concluded here that the waivers or releases signed by the plaintiffs were completely valid. Let us turn to the case of *Home Ins. Co. of New York* v. *Dávila, supra,* and see how the United States Court of Appeals for the First Circuit treated the questions of fact and of law in that case, identical with those before us:

"After the fire losses occurred on October 30, 1950, the insurance companies employed Mr. Benjamín Acosta of Santurce, Puerto Rico, an independent insurance adjuster, to handle for them the various insurance claims in Jayuya and to recommend the action to be taken by the companies in each particular case. The plaintiff described Acosta as a 'friend', but it appears that they had only seen each other two or three times before, in connection with the adjustment by Acosta of a claim by the plaintiff for an earlier fire loss. Acosta came to Jayuya on November 9, 1950. He got in touch with Mr. Dávila, to whom he stated, quite properly, that before he would proceed to investigate the plaintiff's fire losses, it would be necessary for the plaintiff to sign a so-called non-waiver agreement to the effect that investigation by the insurance agent into the claimed fire losses should not be interpreted as a waiver by the companies of any defenses which they might have under the terms of the policies. The plaintiff after consulting a lawyer signed this non-waiver agreement. Thereupon Acosta and the plaintiff undertook to reach an agreement as to the amount of the fire losses which the plaintiff had suffered. When the amount of the plaintiff's damages had thus been agreed upon, Acosta told him that he could not promise him anything at the time; that in his personal opinion, under the clause in the policies excluding liability for losses caused by insurrection or rebellion, the companies were not legally liable for the losses in question. He told the plain-

tiff, however, that he would recommend to the companies that they pay to the insured fifty per cent of the damages suffered, on an *ex-gratia* basis, without accepting liability on the policies.

"Later on, the companies instructed Acosta to go ahead and offer settlements to the plaintiff and to the other claimants on the basis recommended by the insurance agent. Accordingly, Acosta prepared in his office, around the middle of January, 1951, documents of release to be used in concluding these settlements. We quote the terms of a typical release; they were all in substantially the same form: [here is copied the waiver signed by insured Vicente Dávila, which is *mutatis mutandis* identical with those signed by plaintiffs Cruz Vélez and de Jesús.] (Brackets ours.)

" . . . . . . . .

"Shortly thereafter plaintiff called at Acosta's office to inquire about the status of the negotiations, and was informed what the companies were willing to do. Acosta gave him the releases to sign. Plaintiff took these releases with him, without signing them at that time, and kept them for two weeks. He testified that during this period he did not seek legal advice as to whether he should sign the releases; and there is no evidence in the record that he did. It is clear, however, that the insurance agent did not try to dissuade the plaintiff from seeking legal advice, which certainly the plaintiff had ample opportunity to procure, and which, we have seen, the plaintiff did procure before signing the non-waiver agreement. The insurance agent was not under the burden of any fiduciary relationship with the plaintiff, and the settlement must be deemed to have been negotiated on an arm's-length basis. Though the plaintiff was a person of limited formal education, he was a practical and successful businessman in Jayuya, with substantial property holdings.

"Plaintiff testified that he never read the terms of his fire insurance policies. But the insurance agent made no misrepresentations as to the contents of the policy provisions. Nor did he make any misrepresentation of fact as to the events which occurred in Puerto Rico on October 30, 1950, and which might or might not have amounted to an insurrection or rebellion within the meaning of the excepted perils clause. Those events were indeed matters of public notoriety, as well-known to the plaintiff as to Acosta. We have stated above that on December 18, 1950, the Supreme Court of Puerto Rico took

judicial notice of these events, in describing the uprising of October 30 as a 'revolt.' *Guadalupe* v. *Bravo, Warden,* 71 P.R.R. 913, 926.

"In the nature of things, one could not know for sure whether this uprising constituted an insurrection or rebellion within the meaning of the insurance policies until the courts had determined the point in the course of litigation. All that Acosta could do was to express an opinion, perhaps an informed opinion in view of his experience in the insurance field, as to what the courts would or should determine in the matter. And if he truly expressed the opinion which he entertained, he made no misrepresentation of any kind, either of fact or of law.

"Two weeks later Dávila brought the releases back to Acosta's office, still unsigned. He was informed that he could not obtain from the companies the fifty per cent payment offered, unless he signed the releases [6]. Thereupon the plaintiff took the releases to a notary public and formally executed them. Payments totaling $12,000 were then made to the plaintiff pursuant to the terms of the settlements.

"Under the circumstances above related, the insurance companies, or their representative, might well have honestly believed, and not without reason, that they had a good legal defense to the claims, under the terms of the excepted perils clause. Was the case not, therefore, an appropriate one for a settlement, avoiding the hazards of litigation, on some basis other than payment of the losses in full? And how was the

---

[6] We copy from the transcript of evidence appearing in the record the following testimony of Benjamín Acosta, upon being examined by one of the attorneys for the insurance companies:

"Q.—Witness, will you please tell the judge whether prior to that occasion there was any relation between you and Agustín Cruz Vélez or Abraham de Jesús?

"A.—I did not know them.

"Q.—You did not know who they were?

"A.—No, sir.

"Q.—What did they answer, if they did answer, to your statement?

"A.—That I talk it over with the companies to see if they offered any kind of settlement, and then I told them that I was going to recommend to the companies to settle, based on my assessment of the damages, the two claims paying 50 percent of the damages; and in the de Jesús case I informed the company that the damages were more or less $500, so that he would collect a full $200 or $250.

"Q.—What did these gentlemen tell you as to their consent?

"A.—Both told me to write to the company."

insurance agent to explain a company offer to settle for one half the fire damages sustained, except by asserting the company's view that the particular fire losses were not within the policy coverage? Yet on plaintiff's theory, as expounded by his counsel at the trial, the insurance agent 'should not have said anything about liability at all'; that if, in negotiating and inducing a settlement, he represented, however innocently and in good faith, that the insurers were not legally liable, and it turned out that he was mistaken in this view of the law, this would constitute such a false and deceitful representation as would invalidate the settlement and release negotiated by an insurance agent having presumably superior knowledge of the field of insurance law, as contrasted with the insured, who was ignorant of such matters and who, according to plaintiff's story, blindly accepted the insurance agent's assertion of non-liability without seeking outside legal advice, which he had ample opportunity to do. [The Court of Appeals then discusses the scope of its opinion in *Camerlin* v. *New York Central R. Co.*, 1st Cir., 1952, 199 F. 2d 698, stating further:] (Brackets ours.)

". . . . . . . .

"In other words, in the Camerlin case we were applying what we thought was the federal rule in an Employers' Liability Act case, where the railroad had made a settlement directly with its own trusting and uneducated employee. The case at bar has an entirely different setting, and the rule to be applied is one of Puerto Rican local law. We have been unable to find any decision of the Supreme Court of Puerto Rico suggesting that an agreement of settlement and release could, under the law of Puerto Rico, be upset on so flimsy a basis as that advanced by the plaintiff in the present case. It would be unfortunate if such were the law, and we do not believe that it is."

Inasmuch as this is a local question, we are not bound to follow the former ruling. However, we consider it a correct exposition of our law. As in the *Dávila* case, we are of the opinion that if under the circumstances involved in the above-entitled cases the insurers or their representatives honestly believed that they had a valid legal defense to plaintiffs' claims, under the clause exempting them from liability in case of insurrection or rebellion, settlement of the claims in

the cases at bar was appropriate in order to avoid hazards of litigation.

We are not sure whether, in expressing itself as it did in the last sentence of our lengthy citation of the opinion of the Court of Appeals for the First Circuit, the latter had knowledge of our opinion in the case of *Cruz* v. *Water Resources Authority, supra*. Our opinion was delivered on April 13, 1954, and that of the Court of Appeals in the *Dávila* case on May 12 of that same year. But be it as it may, the case of *Cruz* v. *Water Resources Authority* is clearly distinguishable from the *Dávila* case as well as from the cases at bar. In *Cruz* v. *Water Resources Authority* (copied from the syllabus) "An ignorant, simple country lady was visited by an insurance adjuster six days after her six-year old child had been killed by an automobile in a case where the defendant was admittedly liable due to his negligence and, relying on the adjuster's statement that the court would not award her more than $1,000 because the person killed was a minor and not the head of a family—a statement which he knew was false and was made with the intent that the lady would rely on it, as she did—she accepted the adjuster's offer and signed a release." The *Dávila* case, as the Court of Appeals states it, dealt with "a practical and successful businessman . . . with substantial property holdings." The cases at bar, as we have seen, deal with men having experience in the struggle for life, who although lacking formal schooling, had at least ample business experience. Besides, in the *Cruz* case the release was signed on the same day that the adjuster visited the plaintiff when she was still crestfallen by her very recent loss. In the cases at bar the releases or waivers were signed about three months after the events of October 30, more than 2½ months after the adjuster's first visit, and after the plaintiffs had had ample opportunity to reflect on the step which they were about to take. Compare with *Agosto* v. *Porto Rican Express Co.*, 47 P.R.R. 853. It

is not possible, therefore, to conclude that the waivers signed by the plaintiffs were not valid.   Consequently, the actions which they have filed do not lie.

The judgments appealed from will be reversed and the complaints dismissed.