24-0227-cv
*CITGO Petroleum Corp. v. Ascot Underwriting Ltd. et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term 2024

Argued: January 24, 2025
Decided: October 28, 2025
Docket No. 24-0227-cv

———————

CITGO PETROLEUM CORPORATION,

*Plaintiff-Appellee*,

*v.*

ASCOT UNDERWRITING LIMITED, for and on behalf of Lloyd's
Syndicate 1414, PIONEER UNDERWRITING LIMITED, for and on
behalf of Syndicate 9146, MS AMLIN UNDERWRITING LIMITED,
for and on behalf of Lloyd's Syndicate 2001, TRAVELERS
SYNDICATE MANAGEMENT LIMITED, for and on behalf of Lloyd's
Syndicate 5000, BRIT SYNDICATES LIMITED, for and on behalf of
Lloyd's Syndicate 2987, SOMPO INTERNATIONAL INSURANCE,
for and on behalf of Lloyd's Syndicate 5151, CHAUCER SYNDICATES
LIMITED, for and on behalf of Lloyd's Syndicate 1084, MARKEL
SYNDICATE MANAGEMENT LIMITED, for and on behalf of
Lloyd's Syndicate 3000, NEON UNDERWRITING LIMITED, for and on
behalf of Lloyd's Syndicate 2468, STARSTONE INSURANCE SE,

*Defendants-Appellants*.

———————

Before:

CHIN, PÉREZ, and NATHAN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Woods, *J.*) awarding $54.2 million in damages plus interest to the insured in an insurance coverage dispute over a cargo of crude oil seized by Venezuelan authorities. The policy at issue provided coverage for certain war-related risks, including for losses arising from "insurrection," and the insured asserted that it was entitled to coverage for the lost cargo because the attendant political conditions in Venezuela constituted an insurrection within the meaning of that provision. On cross-motions for summary judgment, the district court ruled that an insurrection had occurred within the meaning of the policy, and the case proceeded to trial on the issues of causation and damages. The insured prevailed at trial, and the reinsurers appeal, challenging the district court's summary judgment decision, orders on judicial notice, and jury instructions on the issue of causation.

AFFIRMED.

DAVID F. KLEIN (Richard P. Donoghue, Mark J. Plumer, John P. Chamberlain, and Jeffrey W. Mikoni, *on the brief*), Pillsbury Winthrop Shaw Pittman LLP, New York, NY, and Washington, D.C., *for Plaintiff-Appellee.*

JOHN M. WOODS, Clyde & Co US LLP, New York, NY, *for Defendants-Appellants.*

CHIN, *Circuit Judge*:

In this insurance coverage dispute, Venezuelan authorities seized nearly a million barrels of crude oil from a cargo ship under the threat of force. The oil was insured under a policy (the "Policy") that provided coverage for loss caused by, *inter alia*, an "insurrection." The insured -- plaintiff-appellee CITGO Petroleum Corporation ("CITGO") -- submitted a claim, asserting that the political conditions in Venezuela leading up to the seizure constituted an insurrection within the meaning of the Policy. Defendants-appellants reinsurance companies (the "Reinsurers")[1] disagreed and denied coverage, leading to the instant litigation and appeal.

---

[1] The parties to the Policy are somewhat different from the parties to this litigation and appeal because of the involvement of other non-party insurance companies in the insurance relationship, but it is undisputed that CITGO could pursue its insurance claims directly against the Reinsurers.

- 3 -

On cross-motions for summary judgment, the district court ruled in favor of CITGO and held as a matter of law that an "insurrection" within the meaning of the Policy had occurred. The case proceeded to trial on the issues of causation and damages.

After a five-day trial, the insured prevailed on three of four issues presented to the jury, and judgment in the amount of $54,235,187.24 plus interest was entered in favor of CITGO. The Reinsurers now appeal, challenging the district court's summary judgment decision, orders on judicial notice, and jury instructions on the issue of causation. For the reasons set forth below, we conclude that the district court did not err or abuse its discretion in any of the challenged rulings, and we AFFIRM.

*BACKGROUND*

This appeal involves rulings at two different stages of the litigation below: the district court's summary judgment decision concluding that there was an "insurrection" and the district court's jury instructions on causation. As to the challenge to the summary judgment decision, we accept the undisputed and indisputable facts and otherwise construe the evidence in the light most favorable to the Reinsurers, as the parties opposing summary judgment, and we

- 4 -

draw all reasonable inferences in their favor. *See Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013); *Green v. Town of E. Haven*, 952 F.3d 394, 407 (2d Cir. 2020). As to the challenges involving the trial, we construe the evidence in favor of the prevailing party -- here, CITGO. *See Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 133 (2d Cir. 2025).

## I.     *The Facts*

### A.     *Venezuelan Politics*

In October 2012, Venezuela's longtime leader Hugo Chávez was reelected to a six-year term as president. But after Chávez died five months later, his then-vice president, Nicolás Maduro, stepped in as interim president. Maduro was elected to serve out the remainder of Chávez's term.

By 2015, the political landscape in Venezuela had shifted, and a coalition of Maduro's political opponents won control of the National Assembly, Venezuela's main legislative body. In response, Maduro's supporters began targeting the National Assembly and its members, including by raiding National Assembly buildings and physically attacking and imprisoning politicians from the opposition. As his supporters launched several such attacks over the next

few years, Maduro used his power to arrest and prosecute politicians from the opposition.

In May 2017, tensions escalated after Maduro issued Presidential Decree No. 2830, which called for elections to establish a "National Constituent Assembly" separate and apart from the existing National Assembly. In the face of the ensuing mass protests, Maduro stated:

> We will go into combat. We will never surrender. What could not be done with votes, we will do with arms. We will liberate our nation with arms.

Confidential Deferred Joint Appendix ("Conf. App'x") at 97. Meanwhile, in the United States, these events prompted then-President Donald Trump to impose sanctions on Venezuela and decry the "establishment of an illegitimate Constituent Assembly, which has usurped the power of the democratically elected National Assembly," and the "ongoing repression and persecution of, and violence toward, the political opposition." *Id.* (quoting Exec. Order No. 13808, 82 Fed. Reg. 41155 (Aug. 24, 2017)).

About a year later in May 2018, Maduro called for snap presidential elections and won. On January 23, 2019, however, the National Assembly declared Maduro's reelection to be illegitimate and declared its president, Juan

Guaidó, to be the legitimate interim president of Venezuela until free and fair elections could be held. Maduro nevertheless refused to cede control over the instruments of state power, preventing Guaidó from exercising authority within the country.

The United States refused to recognize the results of the 2018 election. On the same day that the National Assembly declared Guaidó to be interim president, President Trump and Secretary of State Michael Pompeo issued statements recognizing Guaidó as the legitimate leader of Venezuela. And later that month, on January 25, 2019, President Trump issued another executive order in which he further criticized the Maduro regime and extended the existing sanctions on Venezuela. *See id.* at 65 (citing Exec. Order No. 13857, 84 Fed. Reg. 509 (Jan. 25, 2019)); *id.* at 103-04 (same). Crucially, that order broadened the definition of "Government of Venezuela" to include several new entities, such that those entities were then also subject to the sanctions imposed on the Maduro regime.

As the district court aptly noted, "those sanctions set in motion the events that would lead to this case." Special Appendix ("Sp. App'x") at 5.

**B.** *CITGO's Purchase of Oil*

In April 2016, CITGO purchased crude oil from an indirect and wholly owned U.S. subsidiary of Venezuela's state-owned oil company, Petroleos de Venezuela, S.A. ("PDVSA"). Delivery was to be made between April 1, 2016, and April 30, 2021, and "title to, and risk of loss for, all crude oil purchased" under the agreement would pass from PDVSA to CITGO once it was loaded onto the delivery vessel. App'x at 340. This type of transaction between CITGO and PDVSA "ha[d] been part of [their] regular commercial activities . . . for more than thirty-five years." *Id.* at 190.

**C.** *The Policy*

To protect against the risk of loss, CITGO purchased the Policy, a marine cargo reinsurance policy that provided coverage for up to $100,000,000 in losses. In effect from June 1, 2018, to June 1, 2019, the Policy "attache[d] from the time the [cargo] becomes at [CITGO's] risk." *Id.* at 120. It also appended and/or incorporated by reference several conditions of coverage. At issue here is the "Institute War Clauses (Cargo)" condition, which states in relevant part:

RISKS COVERED

Risks

1.      This insurance covers, except as excluded by the provisions of Clauses 3 and 4 below, loss of or damage to the subject-matter insured caused by

      1.1    war civil war revolution rebellion *insurrection*, or civil strife arising therefrom, or any hostile act by or against a belligerent power

      1.2    capture seizure arrest restraint or detainment, arising from risks covered under 1.1 above, and the consequences thereof or attempt threat

      1.3    derelict mines torpedoes bombs or other derelict weapons of war.

*Id.* at 163 (emphasis added). The Policy is "governed by and construed in accordance with the laws of the State of New York." *Id.* at 131.

**D.**      ***The Gerd and the Cargo***

In 2018, CITGO arranged for the transport of the crude oil by chartering a vessel called the M/T Gerd Knutsen (the "Gerd") to carry a total of 939,000 barrels from Venezuela to Aruba. That cargo was loaded onto the Gerd in two stages: one portion was loaded at the Port of Jose in Venezuela between January 20 and 22, 2019, and the second was loaded in the Gulf of Paria, also in Venezuela, on January 27, 2019. The Gerd's master requested clearance to depart Venezuelan waters and sail for Aruba the next day.

### E. *The Loss of the Cargo*

The Gerd never received that clearance. As explained above, President Trump had issued Executive Order No. 13857 two days earlier, thereby extending the sanctions on Venezuela to new entities. Because PDVSA was one of those entities, it was now subject to sanctions, and the executive order cut off CITGO's ability to pay PDVSA for the cargo. On February 1, 2019, PDVSA requested that the cargo be returned to its custody, and CITGO "agree[d] - subject to PDVSA-CITGO's agreement, to cancel the volumes aboard the Gerd." *Id.* at 400. By the end of the month, however, CITGO asked PDVSA to "consider any and all prior discussions regarding the proposed cancellation of [the cargo] . . . to be null and void." *Id.* at 399-400. According to CITGO, "title to [the cargo] passed to CITGO upon loading unto the Gerd" and, contrary to PDVSA's assertions, the sanctions were inconsequential because payment had already been "effected by CITGO by way of crude product swaps." *Id.* at 400, 427-28. But "PDVSA did not accept the offsets claim" and "was unwilling to let the ship sail out of Venezuela without receiving payment." Appellants' Br. at 8-9.

That disagreement soon evolved into a standoff. For months, the Gerd's master repeatedly sought clearance to leave port but never received a

- 10 -

response. Eventually, both parties resorted to various appeals to authority to support their competing claims of ownership over the cargo. CITGO presented PDVSA with a letter dated August 30, 2019, from the Venezuelan Procurador Especial (the Attorney General) that proclaimed the cargo to be "the rightful property" of CITGO and directed all parties "to take any and all necessary steps to clear the Vessel for departure from Venezuelan territory." App'x at 2061-62. But because that Procurador Especial was appointed by Guaidó, the Maduro-controlled PDVSA did not recognize his authority and refused to let the Gerd depart. The Gerd remained at port for several more months.

PDVSA, for its part, sent two letters to the Gerd in November 2019, in which it asserted that it owned the cargo and instructed that the cargo be discharged and returned to it. After the Gerd's master refused, representatives from PDVSA boarded the Gerd on December 22, 2019, to present CITGO with a decision by a Venezuelan criminal court in Caracas ordering "the restitution to PDVSA Petroleo S.A. of the Cargo." App'x at 2063-64 (capitalization altered) (directive); *see id.* at 434-40 (decision). CITGO challenged the validity of the order and continued to refuse to return the cargo, further extending the standoff.

- 11 -

The conflict came to a head in early February 2020. On February 7, 2020, a PDVSA representative boarded the Gerd to inform its master that the Gerd had been given clearance to set sail for Port Jose, where it was to discharge the cargo and return it to PDVSA. The Gerd did not budge. Two days later, a Venezuelan military vessel with a mounted machine gun approached the Gerd, followed by a second vessel that discharged representatives of the military and PDVSA to board the Gerd and order the master to return the cargo. The Gerd's master issued a formal letter of protest but eventually sailed to Port Jose, escorted by a pilot on board, two tugboats, and a Venezuelan Navy patrol boat. The Gerd arrived at Port Jose on February 10 or 11, 2020, and the cargo was thereafter removed and returned to PDVSA.

F. *CITGO's Communications with the Reinsurers*

As these events unfolded, CITGO provided several status updates to the Reinsurers. On July 22, 2019, CITGO provided a "notice of circumstances" and "notice of potential claim" to "inform[] them of the Gerd's situation and of CITGO's ongoing efforts to secure the Cargo, and requesting reimbursement of amounts expended by CITGO in its attempts to prevent the loss of the Cargo and secure its conveyance to Aruba." *Id.* at 74; *see also id.* at 100. That letter did not

- 12 -

mention "insurrection" or the Institute War Clauses. CITGO sent another update on September 6, 2019, informing the Reinsurers that its ongoing efforts were unsuccessful, and that, "considering that the Cargo had been stranded for nearly 9 months with no end in sight, CITGO would have no choice but to abandon the Cargo and declare a Constructive Total Loss." *Id.* at 74-75; *see also id.* at 100-01. In their response dated September 10, 2019, the Reinsurers asserted that CITGO's costs were not compensable, and that an ultimate loss of the cargo under the circumstances would not be covered by the Policy.

The parties continued to exchange letters between early September and late October. On October 25, 2019, CITGO argued for the first time that the Institute War Clauses "provide coverage for detainments arising from insurrection or civil strife," and that those conditions were met because two governments laid competing claims to authority in Venezuela. *Id.* at 76; *see also id.* at 101. But on November 15, 2019, the Reinsurers disputed CITGO's "novel assertion" that the Institute War Clauses were applicable and declared that the Gerd's situation had nothing to do with insurrection, civil strife, or any other war risk. *Id.* at 76, 102. The Reinsurers again asserted that position in a letter dated January 17, 2020.

On February 13, 2020 -- after the Gerd arrived at Port Jose and after the cargo had been seized -- CITGO sent the Reinsurers a Notice of Actual Loss in which it demanded coverage under the Policy's Institute War Clauses. About a month later, the Reinsurers denied CITGO's claim, asserting that the loss was not covered under the Institute War Clauses because the conditions in Venezuela did not constitute an "insurrection" within the meaning of that provision. This lawsuit followed.

## II. *Procedural History*

CITGO initiated this case in January 2021. In its operative complaint filed in March 2021, CITGO advanced a single cause of action for breach of contract, alleging that the Reinsurers breached the Policy by denying coverage under several of its provisions and caused damages exceeding $40 million. The Reinsurers filed their answer a month later, and discovery began.

### A. *Cross-Motions for Summary Judgment*

Almost a year later, the parties filed cross-motions for summary judgment. CITGO asked the district court to "(1) find that an insurrection occurred in Venezuela after January 2019, (2) resolve the standard to apply for causation of the cargo's loss, and (3) reject Defendants' affirmative defense

- 14 -

claiming that CITGO did not own the cargo when it was lost." Sp. App'x at 9; *see also* App'x at 166-67 (notice of motion). The Reinsurers asked the district court "to find that the losses did not arise from an insurrection and to dismiss Plaintiff's case." Sp. App'x at 9; *see also* App'x at 328-30 (notice of motion).

In an order dated November 23, 2022, the district court informed the parties that their "briefing [did] not present a sufficiently thorough discussion of the meaning of the term 'insurrection' as used in the parties' contract" to resolve their cross-motions for summary judgment. App'x at 455. The court therefore ordered the parties to submit additional briefing on "[t]he historical meaning and usage of the term [to] inform" its assessment of the parties' arguments, including whether "the target of an insurrection must have de facto control of territory, and the degree of power that the target of an insurrection must be capable of exercising in order to be treated as such." *Id.* at 456. The parties submitted that briefing in early 2023.

On March 15, 2023, the district court issued an opinion and order in which it granted CITGO's motion for summary judgment in part and denied the Reinsurers' motion for summary judgment in full. As relevant here, the district court determined that an insurrection had occurred in Venezuela within the

- 15 -

meaning of the Policy's Institute War Clauses, and it reached that conclusion in three steps. First, it determined that the Policy term "insurrection" was "ambiguous" because it was not explicitly defined, and "[r]easonable people could disagree about [its] meaning." Sp. App'x at 16.

Second, the court endeavored to apply the definition of "insurrection" set forth by this Court in *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989 (2d Cir. 1974) ("*Pan Am.*"): "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." Sp. App'x at 17 (quoting *Pan Am.*, 505 F.2d at 1017). The court noted that the parties did not dispute that Maduro had used violence to retain control of the country and that the court was bound to recognize Guaidó's as the constituted government of Venezuela because the U.S. Executive Branch had so declared. *Id.* at 18 (referencing the "recognition doctrine" described in *Zivotofsky v. Kerry*, 576 U.S. 1, 17 (2015)). The court struggled, however, with determining whether the Maduro regime's actions constituted an "uprising" intended to "overthrow[]" and "seiz[e] [the] powers" of Guaidó's constituted government. *Id.* at 20-21. Moreover, the court noted that existing case law did not illuminate the issue, as no court had

- 16 -

"considered whether or how an insurrection can occur on this case's extraordinarily unusual facts." *Id.* at 22.

Finally, the district court looked to New York law on the interpretation and resolution of ambiguities in insurance policies. Under New York law, unless either party presents extrinsic evidence about their intent entering into a policy agreement to establish the intended meaning of a disputed term, the doctrine of *contra proferentem* requires courts to resolve ambiguities against the insurer and in favor of coverage. *Id.* at 23-24 (citing *New York v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985)). After concluding that neither party provided any extrinsic evidence bearing on their intended meaning of the term "insurrection," the court determined that it had to read the *Pan Am.* definition "in a way that supports coverage" and granted partial summary judgment on this issue in CITGO's favor. *Id.* at 24-26.

### B. *Judicial Notice*

As relevant to this appeal, the district court's March 15, 2023 order also addressed a motion by CITGO to take judicial notice of certain facts. CITGO had asked the court to take judicial notice of (1) a January 2019 statement by President Trump recognizing Guaidó as the interim president of Venezuela and

a January 2019 press statement by Secretary Pompeo recognizing Guaidó and declaring that Maduro did not have "legal authority" as president; and (2) a set of twenty facts contained in reports by the U.S. State Department, the U.S. Congressional Research Service, and the United Nations.

In the March order, the district court took judicial notice of the statements by President Trump and Secretary Pompeo as statements representing the United States's official position on the legitimate government of Venezuela, but it declined to do so with regard to the truth of the facts underlying those statements. As for the second set of facts, the court cautioned that although they came from sources whose accuracy cannot reasonably be questioned, a fact must itself meet a "high degree of indisputability" to be judicially noticeable. *Id.* at 14-15 (citing Fed. R. Civ. P. 201 advisory committee's notes). Reasoning that a purported fact is most disputable if it contained statements of opinion, the court took judicial notice of a select number of facts that fell on the fact end of the fact-opinion spectrum.

A few months before trial, CITGO filed a motion *in limine* asking the court to take judicial notice of additional facts contained in reports by the State Department, the Congressional Research Service, and the United Nations.

Referring to the principles it laid out in its summary judgment decision, the district court granted in part and denied in part that motion, taking judicial notice only of the facts "not subject to reasonable dispute." *Id*. at 29-32.

C.     *The Trial*

On December 12, 2023, the case proceeded to a five-day trial on causation and damages. At the end of the third day, the court heard an ongoing dispute as to the proper jury instruction on causation based on the Policy's language, which "covers . . . loss of or damage to the subject-matter insured caused by . . . seizure . . . *arising from*" an insurrection. App'x at 163 (emphasis added). In the Reinsurers' view, the "arising from" language required a jury instruction on proximate cause under which "remote causes of losses are not relevant." *Id*. at 1743 (quoting *Pan Am.*, 505 F.2d at 1006). The court pushed back, however, noting that *Pan Am.* "was not looking at the language in this contract." *Id.* But after counsel for the Reinsurers reiterated their position on the basis that "this case is distinguishable," the court stated:

> No, no, no. No. What is the basis for your position under the law? Let me do this. Send me a letter. Sign it under Rule 11. Sign a letter. Send it to me under Rule 11 telling me what the legal, nonfrivolous basis is for you to contest that a New York insurance contract that contains the words "arising from" should be read in the way that you

are describing it. Send me that in a letter. Sign it as an
officer of the court subject to Rule 11 sanction, and I will
consider it.

*Id.* at 1744:9-17. Additional colloquy on the objection followed, after which the

court ordered as follows:

I understand that there are objections . . . . It's not fully
apparent what the legal basis is to the objection to [this
instruction], but I'll see it in counsel's letter. That's due no
later than 8:00 a.m. tomorrow morning.

*Id.* at 1746:5-9. In response, counsel for defendants stated:

Your Honor, if I may, we'll withdraw the objections.

*Id.* at 1746:11-12. But the court clarified:

Thank you. You need not. I'm happy to withdraw them
and will treat them as withdrawn. But if you change your
mind, I'm happy to pursue any position that you
reasonably can or that you believe that you should in
support of your client's interests. I will treat them as
withdrawn, but, again, do not hesitate to raise them if it's
appropriate in your view in the service of your client's
interests. There's no shame in pursuing an argument that
should be presented on behalf of your client. But for now,
I will keep it as it is understanding that the objections are
withdrawn.

*Id.* at 1746:13-22. Ultimately, the issue did not resurface, and the court instructed

the jury on but-for causation as follows:

- 20 -

4.  Meaning of "Arising From"

The phrase "arising from" means that there is at least some causal relationship between the injury and the risk for which coverage is provided.  It is important to keep in mind that the words "arising from" have broader significance than the words "caused by."  Under the law, an event can "arise from" a particular circumstance even if the causal relationship is attenuated.  "Arising out of" means originating from, incident to, or having connection with.  A seizure may have "arisen from" more than one cause.  Again, you must apply the meaning I have given you when reaching your verdict.

*Id.* at 2021:15-25.

CITGO eventually prevailed on three of four issues presented.  First, the jury determined that the Reinsurers breached the Policy's Institute War Clauses provision and awarded CITGO $46,545,593.86 for the loss of the cargo and $2,296,000 for carriage and other charges as incurred.  Second, it determined that the Reinsurers were liable, under the Policy's "Sue and Labor" clause, for costs and expenses that CITGO incurred to protect the cargo and prevent the loss in the amount of $195,155.  Third, it determined that the Reinsurers were liable, under the Policy's "Forwarding Expenses" clause, for $314,279 in additional charges, expenses, and fees incurred in relation to the release, storage, and/or shipment of the cargo.  Finally, and by contrast, the jury determined that the

- 21 -

Reinsurers were not liable, under the Policy's "Demurrage/Late Return Charges" clause, for any late return penalties or demurrage charges.

Judgment in the amount of $54,235,187.24 plus interest was entered in favor of CITGO on December 28, 2023, and this appeal followed.[2]

*DISCUSSION*

The Reinsurers present three principal issues on appeal. They argue that the district court erred by (1) granting CITGO's cross-motion for summary judgment, (2) granting CITGO's requests for judicial notice, and (3) instructing the jury on but-for causation.

**I.** *Summary Judgment*

The Reinsurers first argue that the district erred by granting CITGO's cross-motion for summary judgment. They contend that the district court erred by determining that the contractual term "insurrection" was ambiguous and that that the actions taken by the Maduro regime in Venezuela constituted an insurrection within the meaning of the Policy. In so arguing, Reinsurers also take issue with the district court's determinations of Venezuelan

---

[2]    On December 27, 2023, the district court so-ordered the parties' request to apply a 10% "uplift" to the jury's awards for the loss of the cargo and for carriage and other charges, as required by the Policy. This raised the total award from $49,351,027.86 to $54,235,187.24.

law, under Federal Rule of Civil Procedure 44.1, that Guaidó was the legitimate president of Venezuela and ascended to that role on January 10, 2019.

### A.    *Applicable Law*

We review summary judgment orders *de novo*. *See Eisenberg v. Comm'r*, 155 F.3d 50, 53 (2d Cir. 1998). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under New York law, although it is a policyholder's burden to show that an insurance contract covers a claimed loss, the initial interpretation of the contract is a matter of law to be decided by the court. *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000). That interpretation must "give effect to the intent of the parties," either as "expressed in the clear language of the contract" or -- if that language is ambiguous -- as is ascertainable from extrinsic evidence bearing on the parties' intent at formation. *Id.* (quoting *Village of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)). In other words, courts must favor a plain and ordinary interpretation of unambiguous contractual terms and may turn to extrinsic evidence only when faced with ambiguous ones. *See Alexander & Alexander Servs., Inc. v. These Certain*

*Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). Whether a term is ambiguous is a threshold question of law for the court to decide. *Id.*

"An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person . . . .'" *Morgan Stanley*, 225 F.3d at 275 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). If a court determines that a provision is ambiguous, it must resolve the ambiguity by first referring to "any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Id.* at 275-76 (quoting *Alexander & Alexander*, 136 F.3d at 86). If extrinsic evidence is not available, is inconclusive, or does not otherwise resolve an ambiguous provision, the court may, as a last resort, apply "the rule of contra proferentem, which generally provides that where an insurer drafts a policy[,] 'any ambiguity in the policy should be resolved in favor of the insured.'" *Id.* at 276 (citation modified) (quoting *McCostis v. Home Ins. Co.*, 31 F.3d 110, 113 (2d Cir. 1994)). In this context, the rule of *contra proferentem* means that ambiguous policy *exclusions* are to be construed narrowly, while ambiguous policy *inclusions* are to be construed broadly. *See Pioneer Tower*

*Owners Ass'n v. State Farm Fire & Cas. Co.*, 908 N.E.2d 875, 878 (N.Y. 2009) (interpreting exclusions narrowly); *Handelsman v. Sea Ins. Co.*, 647 N.E.2d 1258, 1259-60 (N.Y. 1994) (interpreting inclusions broadly).

In this case, the contract at issue covers losses "arising from risks" including "insurrection" but does not itself define "insurrection." App'x at 163. This Court defined that term in *Pan Am.* as "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." 505 F.2d at 1017. Although an intent to overthrow is a "crucial element" of this definition, "[a]ny intent to overthrow, no matter how quixotic, is sufficient." *Id.* at 1018-19 ("[T]he revolutionary purpose need not be objectively reasonable.").

B. *Application*

In reviewing the district court's summary judgment ruling, we first note that the parties do not dispute the key facts -- including that Maduro won the 2018 election, Guaidó was declared to be interim president by the National Assembly, and Maduro retained de facto control over the Venezuelan government and military. In other words, the parties disagree only as to the legal consequences of those facts. Based on these uncontroverted facts, we hold

that the district court did not err in its determination that the term "insurrection" was ambiguous, and that, as a matter of law, the Maduro regime constitutes an insurrection within the meaning of the Policy.

1. *Whether the Contractual Term "Insurrection" Is Ambiguous*

The fact that a disputed term is undefined by a contract does not by itself mean that it is ambiguous. *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001); *see also Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*, 205 A.D.3d 76, 81 (1st Dep't 2022), *aff'd*, 235 N.E. 332 (N.Y. 2024). Nor does the fact that the parties urge competing interpretations of that term. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989). Nevertheless, a term is unambiguous only if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (alteration adopted) (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)). Similarly, a finding of unambiguity requires that "the interpretation urged by one party would 'strain the contract language beyond its reasonable and ordinary meaning.'" *Id.* (alteration adopted) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)).

Here, the interpretations urged by both sides pose no significant danger of straining the contractual language, and, more importantly, there is at least a reasonable basis for a difference in opinion as to what "insurrection" means in this context. That term is undefined in the contract, and reference to various dictionary meanings does not resolve whether the Maduro regime fits that definition. *See, e.g.*, *Insurrection*, Black's Law Dictionary (10th ed. 2014) ("A violent revolt against an oppressive authority, usu. a government."); *Insurrection*, Merriam-Webster, https://www.merriam-webster.com/dictionary/insurrection (last visited Oct. 27, 2025) ("[A]n act or instance of revolting against civil authority or an established government."). The contractual term "insurrection" is therefore susceptible to "more than one meaning when viewed objectively by a reasonably intelligent person." *Morgan Stanley*, 225 F.3d at 275 (quoting *Lightfoot*, 110 F.3d at 906). Accordingly, we conclude that the district court did not err in finding that the contractual term "insurrection" was ambiguous.[3]

---

[3]     The Reinsurers assert that "prior to the District Court's erroneous decision in this case, no court interpreting a war risk insurance policy had ever found the term 'insurrection' (or any other term in this traditional war risk coverage) to be ambiguous." Appellants' Br. at 23. They are incorrect -- that exact issue was addressed in *Pan Am*. *See* 505 F.2d at 1001-02 ("Terms such as 'insurrection,' 'rebellion' and 'civil commotion' have received little of the clear judicial construction[.] . . .   The plausibility of several . . . interpretations is convincing evidence of the ambiguity of the exclusions, and a compelling reason for applying contra proferentem against the all risk insurers.").

**2.** *Whether The Maduro Regime's Actions Constitute an "Insurrection"*

The district court did not err by relying on the *Pan Am.* definition of an "insurrection." As we have explained, "an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that [a] term is to have some other meaning." *Hugo Boss*, 252 F.3d at 617-18. Here, the parties have not expressly indicated a definition, nor have they "provided extrinsic evidence about their intent when entering into the Policy that could bear on the ambiguity." Sp. App'x at 24.

We thus consider whether the Policy term "insurrection" was "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." *Pan Am*, 505 F.2d at 1017.[4] This definition has three elements -- violence, an uprising to overthrow and seize powers, and a constituted government.

---

[4] Other courts interpreting similar insurance contract language have also relied on this definition of "insurrection." *See, e.g.*, *Hartford Fire Ins. Co. v. W. Union Co.*, 630 F. Supp. 3d 431, 435-37 (S.D.N.Y. 2022); *Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 91 F.3d 13, 14-15 (3d Cir. 1996), *aff'g*, 899 F. Supp. 1385 (E.D. Pa. 1995); *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1487-93 (S.D.N.Y. 1983).

### i.     *Violence*

We first conclude that the district court did not err in holding that the first element -- which requires that the insurrectionary act be "violent," *Pan Am*, 505 F.2d at 1017 -- was met. Although the Reinsurers argue that the alleged acts of violence in this case were not committed with insurrectionary intent, more fundamentally, they do not argue that there was no violence at all. *See, e.g.,* Appellants' Br. at 31 (acknowledging that there was "political violence directed by the Maduro regime to Guaidó or its other political opponents"); Appellants' Reply Br. at 11 (acknowledging "instances of violence" and "acts of violence directed against Guaidó"); Conf. App'x at 97-98 (Reinsurers stating that they "do not dispute" that episodes of violence attributable to supporters of Maduro took place). As the district court observed, "there is no disagreement that Mr. Maduro and his supporters used violence to suppress Mr. Guaidó and his allies," and the dispute about violence instead "rebound back to [the parties'] central disagreement about power." Sp. App'x at 21 n.8. Insurrectionary or not, the actions of Maduro and his allies were clearly violent.

### ii.   *An "Uprising"*

The second element requires that the violence against a lawfully constituted government be insurrectionary in intent, *i.e.*, that the relevant actions constituted an "uprising by a group or movement . . . acting for the specific purpose of overthrowing the constituted government and seizing its powers." *Pan Am.*, 505 F.2d at 1017.  We conclude that the district court did not err in holding that this element is met.

First, although the district court relied on the rule of *contra proferentem* to reach its conclusion, in our view, the undisputed and indisputable facts establish as a matter of law that Maduro's actions constituted an uprising for the purpose of overthrowing Guaidó and seizing his powers.  At a baseline, that Maduro clearly wanted to overthrow Guaidó's authority is sufficient insurrectionary purpose.  In *Pan Am.* and *Home Insurance Co. of New York v. Davila*, 212 F.2d 731 (1st Cir. 1954) -- both of which involved policy *exclusions* for insurrections -- the issue of insurrectionary intent was pivotal because the goals of the purported insurrectionists were unclear and in dispute.  In *Pan Am.*, we agreed with the district court that there was no insurrectionary intent because there was a dispute as to the airplane hijackers' "states of mind" and a lack of

evidence of intent to overthrow the King of Jordan. *Pan Am*, 505 F.2d at 1019. By contrast, in *Davila*, the First Circuit held that the district court's jury instructions were erroneous because, by requiring that "the action taken . . . fall within such bounds as reasonable men may soundly believe of possible accomplishment" to be considered an insurrection, the district court failed to consider that an insurrection "is no less an insurrection because the chances of success are forlorn." 212 F.2d at 736-38 & n.1; *see also id.* at 737-38 (remanding the case for a retrial because "it was a matter of inference what was in the minds of . . . Nationalist leaders as the objective of the uprising").

Here, the evidence was undisputed that Maduro's goal was to remain in power in Venezuela after his term had ended, notwithstanding the actions of the duly constituted government. As Maduro's supporters raided the National Assembly buildings and physically attacked politicians from the opposition, Maduro himself imprisoned opposition politicians, established a Constituent National Assembly to stand against the existing National Assembly, and, in response to protests in his own country, declared, "We will go into combat. We will never surrender. What could not be done with votes, we will do with arms. We will liberate our nation with arms." Conf. App'x at 97. Taken

together with the fact that Maduro later called snap elections, won them, was deposed by the National Assembly, and refused to cede control over the instruments of state power, we conclude as a matter of law that the Maduro regime was an "uprising . . . acting for the specific purpose of overthrowing the constituted government and seizing its powers." *Pan Am.*, 505 F.2d at 1017.

Second, to the extent there is any doubt about this conclusion, we also conclude that the district court properly applied the rule of *contra proferentem*. At bottom, the Reinsurers argue that the "uprising" element is not met because Guaidó never took de facto control of Venezuela, and so Maduro could not have led an uprising to overthrow Guaidó or seize his powers. But none of the insurance cases involving insurrections has ever required de facto control, and, indeed, they all involve substantially different facts. Although de facto control was a common feature of those cases, it was not at issue because the alleged insurrectionary acts were highly localized, relatively temporary in nature, and conducted by insurgent groups. *See, e.g.*, *Pan Am*, 505 F.2d at 996-97 (attributing the loss of the aircraft to a hijacking by "organizations of Palestinian refugees seeking to return Israel to Arab control"); *Davila*, 212 F.2d at 735 (describing "wave of criminal destruction" conducted by "a band of armed

gangsters belonging to the so-called Nationalist Party"); *Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1468 (S.D.N.Y. 1983) (describing battle for possession of a district in Beirut waged by militia forces).  The Maduro regime, by contrast, was none of those things.  It was not localized, temporary, or insurgent -- Maduro had been in power for over a decade, and no one disputes that he retained de facto control of the country's government and police powers.  Moreover, although Maduro was undeniably already in power, he remained in power only by depriving the existing National Assembly and Guaidó of their powers.  Given these differences, the existing cases do not answer the question of whether the Maduro regime is an "uprising by a group or movement . . . acting for the specific purpose of overthrowing the constituted government and seizing its powers."  *Pan Am*, 505 F.2d at 1017.

Because the traditional tools of contract construction do not clarify the ambiguity in the term "insurrection," the rule of *contra proferentem* requires that we resolve the ambiguity against the Reinsurers and in CITGO's favor.  *See Morgan Stanley*, 225 F.3d at 276.[5]  As we have observed, applying this rule in the

_____

[5]    We note that, contrary to the Reinsurers' assertions, the district court did not impermissibly draw factual inferences at the summary judgment stage by following the rule of *contra proferentem*.  No factual inferences were required on this issue because the

context of an ambiguous policy *inclusion* requires that we construe the provision

broadly. *Compare Pioneer Tower Owners Ass'n*, 908 N.E.2d at 878 (construing a

policy exclusion narrowly), *with Handelsman*, 647 N.E.2d at 1259-60 (construing a

policy inclusion broadly). In any event, insurrection is indeed "the most

rudimentary form" of civil unrest. *Pan Am.*, 505 F.2d. at 1017; *see also Younis Bros.*

*& Co. v. CIGNA Worldwide Ins. Co.*, 91 F.3d 13, 14 (3d Cir. 1996) ("'Insurrection' is

the most basic form of civil unrest, the definition of which encompasses all other

forms of civil commotion addressed by the war risk exclusions in appellants'

policies." (citing *Pan Am.*, 505 F.2d at 1017)). Accordingly, we conclude that the

Maduro regime constitutes an "uprising . . . acting for the specific purpose of

overthrowing the constituted government and seizing its powers." *Pan Am.*, 505

F.2d at 1017.

### iii. *A "Constituted Government"*

Finally, we hold that the district court did not err in finding that the

third element -- which requires that the alleged insurrectionary act be committed

against a "lawfully constituted regime," *Pan Am.*, 505 F.2d at 1005 -- was met.

Under the recognition doctrine, the power to recognize or decline to recognize a

---

meaning of "insurrection" was a question of law for the court to decide. *See Home Indem.*
*Co.*, 486 N.E.2d at 829.

foreign state and its government is committed to the Executive Branch alone. *See Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015); *Cheung v. United States*, 213 F.3d 82, 88-89 (2d Cir. 2000) (collecting cases); *Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994). Because "[r]ecognition is a topic on which the Nation must speak with one voice," *Zivotofsky*, 576 U.S. at 14 (citation modified), "official recognition of a foreign sovereign is solely for the President to determine," *Can*, 14 F.3d at 163, and those determinations are "conclusive on all domestic courts," *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 138 (1938). In other words, "[f]ederal courts lack the authority and institutional competence to make the political judgments involved in ascertaining the legitimacy of foreign systems." *Cheung*, 213 F.3d at 89. Federal courts may -- at most -- decide only the "legal consequences" of those determinations. *Guar. Tr. Co.*, 304 U.S. at 138.

The application of the recognition doctrine is straightforward in this case -- here, the parties do not dispute that President Trump and Secretary Pompeo recognized Juan Guaidó as the interim president of Venezuela in press statements released on January 23, 2019. That factual determination is "conclusive on all domestic courts" including this one, and we decide only the

"legal consequences" that flow from it. *Id.*[6] Accordingly, for purposes of the *Pan Am.* definition of an "insurrection," the district court correctly held that the "constituted government" in Venezuela at the time of the events at issue in this case was Guaidó's.[7]

---

[6] Contrary to the Reinsurers' arguments, the recognition doctrine does implicate the interpretation of contracts between private parties. *See* Appellants' Br. at 38-39; Appellants' July 30, 2025 Ltr., ECF No. 85 at 1-2. For example, in *KMW International v. Chase Manhattan Bank, N.A.*, 606 F.2d 10 (2d Cir. 1979), we held that the Executive's recognition of a revolutionary Iranian government meant that federal courts lacked the power to enjoin that government from drawing on a line of credit established for the benefit of the predecessor government. *Id.* at 17 & n.5. And in *Williams v. Suffolk Insurance Co.*, 38 U.S. 415 (1839), the Supreme Court held that the Executive's refusal to recognize the Governor of Buenos Aires' jurisdiction over the Falkland Islands precluded enforcing an insurance contract defense premised on a marine vessel master's noncompliance with the Governor's regulations. *Id.* at 421. In both of those private insurance disputes, the recognition doctrine prevented the courts from finding facts inconsistent with the Executive's recognition of (or refusal to recognize) a foreign government. *See id.* at 420 ("If this were not the rule, cases might often arise in which, on the most important questions of foreign jurisdiction, there would be an irreconcilable difference between the executive and judicial departments. . . . No well regulated government has ever sanctioned a principle so unwise, and so destructive of national character."). The doctrine likewise prevents us from finding that Maduro's, rather than Guaidó's, coalition was the legitimate governing authority of Venezuela.

The case that the Reinsurers rely on in their Rule 28(j) letter is inapposite. *See* Appellants' July 30, 2025 Ltr., ECF No. 85 (citing *Venezuela US SRL v. Bolivarian Republic of Venezuela*, No. 22-cv-3822, 2025 WL 1635370 (D.D.C. June 9, 2025)). That case involved the application of the public policy exception to a treaty on the confirmation of arbitral awards, and that court declined to apply the exception only because recognition did not involve "basic notions of morality and justice" -- as required by the exception. *Venezuela US SRL*, 2025 WL 16535370, at *6. The court still emphasized, however, that the President's recognition power is absolute, exclusive, and "conclusive on all domestic courts." *Id*.

[7] For similar reasons, we find the Reinsurers' challenges to the district court's determinations of Venezuelan law to be unavailing. Under Rule 44.1, district courts are

- 36 -

Accordingly, the district court did not err in holding that the Maduro regime's actions constituted an "insurrection" within the meaning of the Policy, nor did it err in granting summary judgment in favor of CITGO. If the parties intended to limit the coverage inclusion to fewer or more specific instances of "insurrection," they should have done so explicitly. *See Pan Am.*, 505 F.2d at 1007.

## II. *Judicial Notice*

The Reinsurers next challenge the district court's rulings on CITGO's requests for judicial notice. Specifically, the Reinsurers contend that the district court abused its discretion in taking judicial notice of facts that were in dispute, not relevant to the issues, or did not come from sources whose accuracy cannot reasonably be questioned.

---

empowered to make determinations of foreign law, which are reviewed *de novo* by this Court. Fed. R .Civ. P. 44.1. We need not resolve these challenges, however, because even if the district court erred in its determination as a matter of Venezuelan law, it did not err as a matter of U.S. law. The U.S. Executive Branch recognized the Guaidó government on January 23, 2019 -- *i.e.*, days before the cargo was loaded onto the Gerd and over a year before it was ultimately seized -- and the district court was bound by that determination. *See Zivotofsky*, 576 U.S. at 28.

**A.**     *Applicable Law*

This Court reviews a district court's determination whether to take judicial notice of documents for abuse of discretion.  *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 424 (2d Cir. 2008).  An abuse of discretion is found only when the decision (1) rests on an error of law, (2) rests on a clearly erroneous factual finding, or (3) cannot be located within the range of permissible decisions.  *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

Under Federal Rule of Evidence 201(b), a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)."  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998).  But as a general matter, "[j]udicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper."  *Menominee Ind. Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

**B.** *Application*

The Reinsurers argue that the district court abused its discretion in taking judicial notice of three sets of facts. We analyze each set in turn and conclude that the district court did not abuse its discretion.

**1.** *Facts in Dispute*

The Reinsurers first take issue with the judicially noticed fact that, "On January 23, 2019, Juan Guaidó, as president of the National Assembly, assumed the role of interim president pursuant to the provision of the constitution related to vacancies," on the basis that this is a fact in dispute. This challenge fails. As we have stated, President Trump's recognition of the Guaidó government is "conclusive on all domestic courts," including this one. *Guar. Tr. Co.*, 304 U.S. at 138. Accordingly, the district court did not abuse its discretion by taking judicial notice of this fact. *See KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, at 17 n.5 (2d. Cir. 1979) ("Recognition is a matter to which the courts are bound by the Executive Branch's determination, *and of which the court may take judicial notice.*" (emphasis added) (first citing *Guar. Tr. Co.*, 304 U.S. at 137-38; then citing *United States v. Belmont*, 301 U.S. 324, 330 (1937))).

### 2. *Facts Not Relevant to the Dispute*

The Reinsurers also take issue with several judicially noticed facts that they claim are not relevant to the issues. This challenge fails for the simple reason that the Reinsurers' opening brief does not state which specific facts were improper subjects of judicial notice. *See* Fed. R. App. P. 28(a)(8)(A) ("The appellant's brief must contain, under appropriate headings and in the order indicated, . . . the argument, which must contain . . . appellant's contentions and the reasons for them, with citations to the authorities *and parts of the record on which the appellant relies . . . .*" (emphasis added)).

True, the Reinsurers presented one judicially noticed fact in this category with which it has an issue -- but they do so only in a footnote. *See* Appellants' Br. at 57 n.13. But as our cases instruct, "[w]e do not consider an argument mentioned only in a footnote to be adequately raised." *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993); *see also Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) (collecting cases). Similarly, although the Reinsurers did eventually specify five additional facts to be challenged under this category in the main body of its briefing, they did so only in reply. *See* Appellants' Reply Br. at 23-24. As our

cases also instruct, "arguments not raised in an appellant's opening brief, but only in his reply brief, are not properly before an appellate court." *McCarthy v. SEC*, 406 F.3d 179, 186 (2d Cir. 2005). Because the Reinsurers did not timely or properly specify the facts that it contends were improper subjects of judicial notice on the basis that they were not relevant, they have waived that argument. *See id.* ("[I]t is not our obligation to ferret out a party's arguments.").

Even assuming that the Reinsurers did not waive their argument regarding these six judicially noticed facts, the argument fails on the merits. According to one of those facts, "the majority of the National Assembly reconvened . . . in the capital and voted to reelect Juan Guaidó interim president of Venezuela." Appellants' Reply Br. at 24. The district court did not abuse its discretion by taking judicial notice of this fact because, as stated above, it was bound by the U.S. Executive Branch's determination that Guaidó was the legitimate president of Venezuela. *Guar. Tr. Co.*, 304 U.S. at 138. Meanwhile, the remaining five facts to which the Reinsurers object all involve statements about or acts of violence. *See, e.g.*, Appellants' Reply Br. at 24 ("National guard and militias loyal to Maduro violently put down pro-Guaidó supporters and attacked journalists."). But as also noted above, the Reinsurers do not argue that there

was no violence in Venezuela and even acknowledged several instances of violence directed against Guaidó and his supporters. Crucially, the Reinsurers do not dispute that other instances of violence not covered by the facts to which they object occurred. *See* Conf. App'x at 98 ("Defendants do not dispute that attacks on the National Assembly buildings and its members have been attributed to supporters of Maduro."). Because these five facts were not in dispute and because they could not have been dispositive on summary judgment, we hold that it was not an abuse of discretion for the district court to take judicial notice of them. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 144 (2d Cir. 2000) (explaining that where "the facts of which the district court took judicial notice were merely background history and of no moment to the ultimate determination," the district court's judicial-notice decision need not be disturbed).

### 3. *Facts from Unreliable Sources*

Finally, the Reinsurers take issue with judicially noticed facts from reports by the U.S. State Department, the Congressional Research Service, and the United Nations on the basis that those are not sources whose accuracy cannot reasonably be questioned. This challenge also fails.

As an initial matter, the Reinsurers again did not specify which specific facts from these sources were inappropriate for judicial notice, and so arguments regarding these facts are also waived. *See Restrepo*, 986 F.2d at 1463; *Niagara Mohawk Power Corp.*, 673 F.3d at 107; *McCarthy*, 406 F.3d at 186. Moreover, we are doubtful that the district court abused its discretion in admitting facts from these three sources. Federal Rule of Evidence 201 permits judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Rule also requires a court to hear parties "on the propriety of taking judicial notice and the nature of the fact to be noticed." *Id.* 201(e). Here, the district court invited extensive briefing on these issues and carefully considered each fact and source to be judicially noticed. Indeed, rather than taking judicial notice of *every* fact contained in the challenged documents simply because the documents themselves were reliable, the district court took pains to distinguish between statements appropriate for judicial notice and those that were not -- all while specifying the reasons for its conclusion as to each statement. That precision and care are a far cry from an abuse of discretion.[8]

---

[8]     We also reject the Reinsurers' argument that reports by the U.S. State Department, the Congressional Research Service, and the United Nations are sources

- 43 -

Finally, we note that the Reinsurers' argument that the judicially noticed facts were prejudicial is unavailing because they only conclusorily assert prejudice in their opening brief. And when pressed on reply, their arguments for prejudice are that (1) "[t]he facts were presented to the jury and informed its verdict," and (2) judicial notice deprived them of the opportunity to use rebuttal evidence, cross-examination, and argument to attack the evidence. Appellants' Reply Br. at 24-25. But the first reason does not show prejudice -- if every harmful piece of evidence were prejudicial and thus excludable, it would be impossible to conduct a trial. And the second reason is simply a recitation of the mechanics of judicial notice, and the dangers inherent in that process are already lessened by the requirement that courts allow argument "on the propriety of taking judicial notice," as the district court duly did in this case. Fed. R. Evid. 201(e).

---

whose accuracy cannot reasonably be questioned. The Courts of Appeals for the D.C. and Seventh Circuits have taken judicial notice of facts contained in reports by both the State Department and the Congressional Research Service, deeming both those sources to be "reliable." *See, e.g.*, *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021); *Thompson*, 161 F.3d at 456. It appears that reports from the United Nations are similarly reliable. *Cf. EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1048 (C.D. Cal. 2013) ("Public facts concerning the governments of sovereign nations that 'are capable of immediate and accurate determination' are appropriate subjects of judicial notice." (quoting *Collins v. Loisel*, 259 U.S. 309, 314 (1922))).

Accordingly, any error was not prejudicial and therefore harmless, and we conclude that the district court did not err in its rulings on judicial notice.

## III.  *Jury Instruction*

Finally, the Reinsurers argue that the district court incorrectly instructed the jury on the applicable standard for causation under New York law.  They argue that, rather than instructing the jury on but-for causation, the court should have instructed the jury on proximate causation because it is "a bedrock principle of admiralty law."  Appellants' Reply Br. at 31; *see also* Appellants' Br. at 63-64 (citing cases).  CITGO urges otherwise, both on the law, and on the basis that the Reinsurers have waived that argument.

### A.  *Applicable Law*

This Court reviews district court jury instructions *de novo*.  *LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 460 (2d Cir. 1999).  Although an instruction is erroneous "if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law," a new trial will not be granted if the error is harmless.  *Id.* (quoting *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).  An error is harmless if this Court is "convinced that the error

- 45 -

did not influence the jury's verdict." *Id.* at 462 (quoting *United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996)).

Insurance contracts ordinarily require that there be some causal link between the claimed loss and an enumerated set of covered events, and that causal link usually will come in the form of either a but-for or proximate causation requirement. *See Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017). A but-for cause is "[t]he cause without which the event could not have occurred." *Cause*, Black's Law Dictionary (12th ed. 2024). There can be multiple but-for causes. *See Burlington Ins. Co.*, 79 N.E.3d at 481-82. A proximate cause in the insurance context, by contrast, is "[a] single event or peril that directly causes a loss without which the loss would not have occurred." *Cause*, Black's Law Dictionary (12th ed. 2024). In other words, but-for causation sweeps more broadly than proximate causation. *See Burlington Ins. Co.*, 79 N.E.3d at 481-82. To determine which standard must be met to obtain coverage under a policy, we turn to the language of the contract. *See Morgan Stanley*, 225 F.3d at 275 ("Under New York law, 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'" (quoting *Village of Sylvan Beach*, 55 F.3d at 115)).

In *Pan Am.*, this Court construed insurance policies that excluded coverage for "'loss or damage *due to or resulting from*' the various enumerated perils" and concluded that that provision "clearly refer[red] to the *proximate cause* of the loss." 505 F.2d at 1006 (emphases added). We noted that, although a proximate cause requirement was traditionally applied in marine insurance cases only, it could also apply in other contexts, including the aircraft hijacking that occurred in *Pan Am. Id.* at 1007-08 (collecting cases). But we also advised that "if the insurer desires to have more remote causes determine the scope of exclusion, he may draft language to effectuate that desire." *Id.* at 1007.

In *Maroney v. New York Central Mutual Fire Insurance Co.*, 839 N.E.2d 886 (N.Y. 2005), the New York Court of Appeals construed an insurance policy that excluded coverage for "bodily injury or property damage . . . *arising out of* a premises " and concluded that but-for causation applied. *Id.* at 888 (alterations in original and emphasis added). The plaintiff there wanted to apply a proximate cause requirement, arguing that the exclusion should "appl[y] only to injuries that are *causally connected* to the physical condition of the premises." *Id.* (emphasis added). But the court disagreed, concluding that but-for causation was the proper standard because "the phrase 'arising out of' . . . requires only that

there be *some* causal relationship between the injury and the risk for which coverage is provided." *Id.* at 889 (emphasis added). Like the Second Circuit in *Pan Am.*, the New York Court of Appeals in *Maroney* noted that "[i]f the insurer intended to limit the exclusion to injury resulting from a condition on the uninsured premises, it could have done so explicitly." *Id.*

Finally, in *Burlington Insurance Co.*, the New York Court of Appeals cautioned that if policy language is unclear on which standard of causation applies, courts should give meaning to the legal concept communicated by that language instead. 79 N.E.3d at 482-83. Specifically, it held that the contractual phrase "caused, in whole or in part," communicated a proximate cause requirement even though the parties did not explicitly use the phrase "proximate cause" in the policy. *Id.* Reasoning that but-for causation "cannot be partial," the court emphasized that the policy language "expresse[d] in lay terms what the courts have long defined as 'proximate causation,'" and so "[t]he fact that the parties could have used different language to communicate that legal concept [was] not fatal" to that interpretation. *Id.* at 483.

**B.** *Application*

We conclude first that the Reinsurers waived their arguments on this point and second, on the merits, that the Policy provides for but-for causation.

**1.** *Waiver*

We find that the Reinsurers' challenge to the district court's jury instruction on causation fails because counsel for the Reinsurers explicitly waived that argument at trial. After being challenged by the district court on his legal basis for his objection, counsel for the Reinsurers stated, "Your Honor, if I may, we'll withdraw the objections." App'x at 1746:11-12. Although the district court then stated that counsel "need not" do so, and that counsel could raise the argument again "if it's appropriate in [his] view in the service of [his] client's interests," *id.* at 1746:13-19, the issue was not raised again until this appeal.

On appeal, the Reinsurers argue that their initial lodging of the objection suffices to preserve the question for our review. Not so. Their later-in-time withdrawal controls and is binding. This Court has "identified waiver where a party asserts, but subsequently withdraws, an objection in the district court." *United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015) (collecting cases). A party may not withdraw its objections to a jury instruction, only to later appeal

a verdict that was reached according to that instruction. *See Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 55 (2d Cir. 1992) ("Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions.").

The Reinsurers justify their withdrawal as a function of duress, pointing to the district court's "impossible deadline" and repeated threats of sanctions under Federal Rule of Civil Procedure 11. *See* Appellants' Br. at 65-66 n.13; Appellants' Reply Br. at 30-31. But those arguments are unavailing. Under Rule 11, "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record" attesting that they abide by Rule 11(b). Fed. R. Civ. P. 11(a)-(b). That the court *reminded* counsel of that continuing obligation is of no moment. To preserve the issue for appeal, the Reinsurers had to preserve their objection, either by submitting the letter, renewing the objection at a later time, or at least indicating on the record that the objection stood. By pursuing any of those avenues, the Reinsurers could have preserved other issues collateral to those actions for appeal, including a potential sanctions order. Counsel did not do so and instead withdrew the objection wholesale, thereby waiving the right to pursue the argument on appeal.

## 2.    *Causation*

Even assuming that the Reinsurers did not waive their causation argument, it fails on the merits.  We conclude that the district court properly instructed the jury on but-for causation because the Policy provides for coverage in the event of "loss of or damage . .  caused by . . . seizure . . . *arising from*" insurrection, App'x at 163 (emphasis added), and the New York Court of Appeals has held that the substantially similar phrase, "arising out of," established a but-for causation standard.  *Burlington Ins. Co.*, 79 N.E.3d at 483 ("All that matters is the language adopted by the parties to the insurance policy at issue . . . .  [A]rising out of' is *not* the functional equivalent of 'proximately caused by.'" (emphasis added)).

The Reinsurers essentially argue that the correct causation standard arises from case law based on the *type* of dispute or area of law involved, rather than the language of the contract.  Appellants' Br. at 64 ("This Court [in *Pan Am.*] could not have been more explicit as to the applicability of the proximate cause test to marine insurance policies such as this one.").  But that is contrary to the law.  The Reinsurers ignore the fact that *Pan Am.* itself was not a marine insurance case but one that involved an aircraft hijacking.  Moreover, under New

York law, we must give effect to the intent of the parties as expressed in the clear language of the contract, *see Morgan Stanley*, 225 F.3d at 275, and the New York Court of Appeals has consistently interpreted the contractual phrase "arising out of" as requiring a but-for causation standard, *see, e.g.*, *Maroney*, 839 N.E.2d at 889; *Burlington Ins. Co.*, 79 N.E.3d at 483. Although we stated in *Pan Am.* that marine insurance cases "establish a mechanical test of proximate causation," *Pan Am.*, 505 F.2d at 1007, that declaration was made in the specific context of an insurance policy provision that excluded coverage for loss or damage "due to or resulting from" insurrection, and with the caveat that future parties may draft different contract language should they "desire[] to have more remote causes determine the scope of exclusion." *Id.* Because the parties in this case negotiated contractual language that mirrored the language in *Maroney*, the causation standard from that case applies, and the district court did not err on its instruction to the jury.

## CONCLUSION

For the reasons set forth above, the Reinsurers have failed to show that the district court erred in any of the challenged rulings. Accordingly, we AFFIRM the district court's rulings and judgment in all respects.